Justice Ginsburg
delivered the opinion of the Court.
In 2001, Enron Corporation, then the seventh highest-revenue-grossing company in America, crashed into bankruptcy. We consider in this opinion two questions arising from the prosecution of Jeffrey Skilling, a longtime Enron executive, for crimes committed before the corporation’s collapse. First, did pretrial publicity and community prejudice prevent Skilling from obtaining a fair trial? Second, did the jury improperly convict Skilling of conspiracy to commit “honest-services” wire fraud, 18 U. S. C. §§371, 1343, 1346?
Answering no to both questions, the Fifth Circuit affirmed Skilling’s convictions. We conclude, in common with the Court of Appeals, that Skilling’s fair-trial argument fails; *368 Skilling, we hold, did not establish that a presumption of juror prejudice arose or that actual bias infected the jury that tried him. But we disagree with the Fifth Circuit’s honest-services ruling. In proscribing fraudulent deprivations of “the intangible right of honest services,” § 1346, Congress intended at least to reach schemes to defraud involving bribes and kickbacks. Construing the honest-services statute to extend beyond that core meaning, we conclude, would encounter a vagueness shoal. We therefore hold that § 1346 covers only bribery and kickback schemes. Because Skilling’s alleged misconduct entailed no bribe or kickback, it does not fall within § 1346’s proscription. We therefore affirm in part and vacate in part.
I
Founded in 1985, Enron Corporation grew from its headquarters in Houston, Texas, into one of the world’s leading energy companies. Skilling launched his career there in 1990 when Kenneth Lay, the company’s founder, hired him to head an Enron subsidiary. Skilling steadily rose through the corporation’s ranks, serving as president and chief operating officer, and then, beginning in February 2001, as chief executive officer. Six months later, on August 14, 2001, Skilling resigned from Enron.
Less than four months after Skilling’s departure, Enron spiraled into bankruptcy. The company’s stock, which had traded at $90 per share in August 2000, plummeted to pennies per share in late 2001. Attempting to comprehend what caused the corporation’s collapse, the U. S. Department of Justice formed an Enron Task Force, comprising prosecutors and Federal Bureau of Investigation agents from around the Nation. The Government’s investigation uncovered an elaborate conspiracy to prop up Enron’s short-run stock prices by overstating the company’s financial well-being. In the years following Enron’s bankruptcy, the Government prosecuted dozens of Enron employees who participated in the scheme. In time, the Government worked its way up *369 the corporation’s chain of command: On July 7, 2004, a grand jury indicted Skilling, Lay, and Richard Causey, Enron’s former chief accounting officer.
These three defendants, the indictment alleged,
“engaged in a wide-ranging scheme to deceive the investing public, including Enron’s shareholders,... about the true performance of Enron’s businesses by: (a) manipulating Enron’s publicly reported financial results; and (b) making public statements and representations about Enron’s financial performance and results that were false and misleading.” App. ¶ 5, p. 277a.
Skilling and his co-conspirators, the indictment continued, “enriched themselves as a result of the scheme through salary, bonuses, grants of stock and stock options, other profits, and prestige.” Id., ¶ 14, at 280a.
Count 1 of the indictment charged Skilling with conspiracy to commit securities and wire fraud; in particular, it alleged that Skilling had sought to “depriv[e] Enron and its shareholders of the intangible right of [his] honest services.” Id., ¶ 87, at 318a.[1] The indictment further charged Skilling with more than 25 substantive counts of securities fraud, wire fraud, making false representations to Enron’s auditors, and insider trading.
In November 2004, Skilling moved to transfer the trial to another venue; he contended that hostility toward him in Houston, coupled with extensive pretrial publicity, had poisoned potential jurors. To support this assertion, Skilling, aided by media experts, submitted hundreds of news reports detailing Enron’s downfall; he also presented affidavits from *370 the experts he engaged portraying community attitudes in Houston in comparison to other potential venues.
The U. S. District Court for the Southern District of Texas, in accord with rulings in two earlier instituted Enron-related prosecutions,[2] denied the venue-transfer motion. Despite “isolated incidents of intemperate commentary,” the court observed, media coverage “ha[d] [mostly] been objective and unemotional,” and the facts of the case were “neither heinous nor sensational.” App. to Brief for United States 10a-lla.[3] Moreover, “courts ha[d] commonly” favored “effective voir dire ... to ferret out any [juror] bias.” Id, at 18a. Pretrial publicity about the case, the court concluded, did not warrant a presumption that Skilling would be unable to obtain a fair trial in Houston. Id., at 22a.
In the months leading up to the trial, the District Court solicited from the parties questions the court might use to screen prospective jurors. Unable to agree on a question *371 naire’s format and content, Skilling and the Government submitted dueling documents. On venire members’ sources of Enron-related news, for example, the Government proposed that they tick boxes from a checklist of generic labels such as “[television,” “[n]ewspaper,” and “[r]adio,” Record 8415; Skilling proposed more probing questions asking venire members to list the specific names of their media sources and to report on “what st[ood] out in [their] mind[s]” of “all the things [they] ha[d] seen, heard or read about Enron,” id., at 8404-8405.
The District Court rejected the Government’s sparer inquiries in favor of Skilling’s submission. Skilling’s questions “[we]re more helpful,” the court said, “because [they] [we]re generally ... open-ended and w[ould] allow the potential jurors to give us more meaningful information.” Id., at 9539. The court converted Skilling’s submission, with slight modifications, into a 77-question, 14-page document that asked prospective jurors about, inter alia, their sources of news and exposure to Enron-related publicity, beliefs concerning Enron and what caused its collapse, opinions regarding the defendants and their possible guilt or innocence, and relationships to the company and to anyone affected by its demise.[4]
*372 In November 2005, the District Court mailed the questionnaire to 400 prospective jurors and received responses from nearly all the addressees. The court granted hardship exemptions to approximately 90 individuals, id., at 11773-11774, and the parties, with the court’s approval, further winnowed the pool by excusing another 119 for cause, hardship, or physical disability, id., at 11891, 13594. The parties agreed to exclude, in particular, “each and every” prospective juror who said that a pre-existing opinion about Enron or the defendants would prevent her from impartially considering the evidence at trial. Id., at 13668.
On December 28, 2005, three weeks before the date scheduled for the commencement of trial, Causey pleaded guilty. Skilling’s attorneys immediately requested a continuance, and the District Court agreed to delay the proceedings until the end of January 2006. Id., at 14277. In the interim, Skilling renewed his change-of-venue motion, arguing that the juror questionnaires revealed pervasive bias and that news accounts of Causey’s guilty plea further tainted the jury pool. If Houston remained the trial venue, Skilling urged that “jurors need to be questioned individually by both the Court and counsel” concerning their opinions of Enron and “publicity issues.” Id., at 12074.
The District Court again declined to move the trial. Skilling, the court concluded, still had not “establish[ed] that pretrial publicity and/or community prejudice raise[d] a presumption of inherent jury prejudice.” Id., at 14115. The questionnaires and voir dire, the court observed, provided *373 safeguards adequate to ensure an impartial jury. Id., at 14115-14116.
Denying Skilling’s request for attorney-led voir dire, the court said that in 17 years on the bench:
“I’ve found ... I get more forthcoming responses from potential jurors than the lawyers on either side. I don’t know whether people are suspicious of lawyers — but I think if I ask a person a question, I will get a candid response much easier than if a lawyer asks the question.” Id., at 11805.
But the court promised to give counsel an opportunity to ask followup questions, ibid., and it agreed that venire members should be examined individually about pretrial publicity, id., at 11051-11053. The court also allotted the defendants jointly 14 peremptory challenges, 2 more than the standard number prescribed by Federal Rule of Criminal Procedure 24(b)(2) and (c)(4)(B). Id., at 13673-13675.
Voir dire began on January 30, 2006. The District Court first emphasized to the venire the importance of impartiality and explained the presumption 'of innocence and the Government’s burden of proof. The trial, the court next instructed, was not a forum “to seek vengeance against Enron’s former officers,” or to “provide remedies for” its victims. App. 823a. “The bottom line,” the court stressed, “is that we want . . . jurors who . . . will faithfully, conscientiously and impartially serve if selected.” Id., at 823a-824a. In response to the court’s query whether any prospective juror questioned her ability to adhere to these instructions, two individuals indicated that they could not be fair; they were therefore excused for cause, id., at 816a, 819a-820a.
After questioning the venire as a group,[5] the District Court brought prospective jurors one by one to the bench *374 for individual examination. Although the questions varied, the process generally tracked the following format: The court asked about exposure to Enron-related news and the content of any stories that stood out in the prospective juror’s mind. Next, the court homed in on questionnaire answers that raised a red flag signaling possible bias. The court then permitted each side to pose followup questions. Finally, after the venire member stepped away, the court entertained and ruled on challenges for cause. In all, the court granted one of the Government’s for-cause challenges and denied four; it granted three of the defendants’ challenges and denied six. The parties agreed to excuse three additional jurors for cause and one for hardship.
By the end of the day, the court had qualified 38 prospective jurors, a number sufficient, allowing for peremptory challenges, to empanel 12 jurors and 4 alternates.[6] Before the jury was sworn in, Skilling objected to the seating of six jurors. He did not contend that they were in fact biased; instead, he urged that he would have used peremptories to exclude them had he not exhausted his supply by striking *375 several venire members after the court refused to excuse them for cause. Supp. App. 3sa-4sa (Sealed).[7] The court overruled this objection.
After the jurors took their oath, the District Court told them they could not discuss the case with anyone or follow media accounts of the proceedings. “[E]ach of you,” the court explained, “needs to be absolutely sure that your decisions concerning the facts will be based only on the evidence that you hear and read in this courtroom.” App. 1026a.
Following a four-month trial and nearly five days of deliberation, the jury found Skilling guilty of 19 counts, including the honest-services-fraud conspiracy charge, and not guilty of 9 insider-trading counts. The District Court sentenced Skilling to 292 months’ imprisonment, 3 years’ supervised release, and $45 million in restitution.
On appeal, Skilling raised a host of challenges to his convictions, including the fair-trial and honest-services arguments he presses here. Regarding the former, the Fifth Circuit initially determined that the volume and negative tone of media coverage generated by Enron’s collapse created a presumption of juror prejudice. 554 F. 3d 529, 559 (2009).[8] The court also noted potential prejudice stemming from Causey’s guilty plea and from the large number of victims in Houston — from the “[thousands of Enron employ *376 ees ... [who] lost their jobs, and... saw their 401(k) accounts wiped out,” to Houstonians who suffered spillover economic effects. Id., at 559-560.
The Court of Appeals stated, however, that “the presumption [of prejudice] is rebuttable,” and it therefore examined the voir dire to determine whether “the District Court em-' paneled an impartial jury.” Id., at 561 (internal quotation marks, italics, and some capitalization omitted). The voir dire was, in the Fifth Circuit’s view, “proper and thorough.” Id., at 562. Moreover, the court noted, Skilling had challenged only one seated juror — Juror 11 — for cause. Although Juror 11 made some troubling comments about corporate greed, the District Court “observed [his] demeanor, listened to his answers, and believed he would make the government prove its ease.” Id., at 564. In sum, the Fifth Circuit found that the Government had overcome the presumption of prejudice and that Skilling had not “show[n] that any juror who actually sat was prejudiced against him.” Ibid.
The Court of Appeals also rejected Skilling’s claim that his conduct did not indicate any conspiracy to commit honest-services fraud. “[T]he jury was entitled to convict Skilling,” the court stated, “on these elements”: “(1) a material breach of a fiduciary duty ... (2) that results in a detriment to the employer,” including one occasioned by an employee’s decision to “withhold material information, i. e., information that he had reason to believe would lead a reasonable employer to change its conduct.” Id., at 547. The Fifth Circuit did not address Skilling’s argument that the honest-services statute, if not interpreted to exclude his actions, should be invalidated as unconstitutionally vague. Brief for Defendant-Appellant Skilling in No. 06-20885 (CA5), p. 65, n. 21.
Arguing that the Fifth Circuit erred in its consideration of these claims, Skilling sought relief from this Court. We granted certiorari, 558 U. S. 945 (2009), and now affirm in *377 part, vacate in part, and remand for further proceedings.[9] We consider first Skilling’s allegation of juror prejudice, and next, his honest-services argument.
II
Pointing to “the community passion aroused by Enron’s collapse and the vitriolic media treatment” aimed at him, Skilling argues that his trial “never should have proceeded in Houston.” Brief for Petitioner 20. And even if it had been possible to select impartial jurors in Houston, “[t]he truncated voir dire ... did almost nothing to weed out prejudices,” he contends, so “[f]ar from rebutting the presumption of prejudice, the record below affirmatively confirmed it.” Id., at 21. Skilling’s fair-trial claim thus raises two distinct questions. First, did the District Court err by failing to move the trial to a different venue based on a presumption of prejudice? Second, did actual prejudice contaminate Skilling’s jury?[10]
A
1
The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury. By constitutional design, that trial occurs “in the State where the . . . Crimes . . . *378 have been committed.” Art. III, §2, cl. 3. See also Arndt. 6 (right to trial by “jury of the State and district wherein the crime shall have been, committed”). The Constitution’s place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district at the defendant’s request if extraordinary local prejudice will prevent a fair trial — a “basic requirement of due process,” In re Murchison, 349 U. S. 133, 136 (1955).[11]
2
“The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.” Patterson v. Colorado ex rel. Attorney General of Colo., 205 U. S. 454, 462 (1907) (opinion for the Court by Holmes, J.). When does the *379 publicity attending conduct charged as criminal dim prospects that the trier can judge a case, as due process requires, impartially, unswayed by outside influence? Because most cases of consequence garner at least some pretrial publicity, courts have considered this question in diverse settings. We begin our discussion by addressing the presumption of prejudice from which the Fifth Circuit’s analysis in Skilling’s case proceeded. The foundation precedent is Rideau v. Louisiana, 373 U. S. 723 (1963).
Wilbert Rideau robbed a bank in a small Louisiana town, kidnaped three bank employees, and killed one of them. Police interrogated Rideau in jail without counsel present and obtained his confession. Without informing Rideau, no less seeking his consent, the police filmed the interrogation. On three separate occasions shortly before the trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. Rideau moved for a change of venue, arguing that he could not receive a fair trial in the parish where the crime occurred, which had a population of approximately 150,000 people. The trial court denied the motion, and a jury eventually convicted Rideau. The Supreme Court of Louisiana upheld the conviction.
We reversed. “What the people [in the community] saw on their television sets,” we observed, “was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder.” Id., at 725. “[T]o the tens of thousands of people who saw and heard it,” we explained, the interrogation “in a very real sense was Rideau’s trial — at which he pleaded guilty.” Id., at 726. We therefore “d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire,” that “[t]he kangaroo court proceedings” trailing the televised confession violated due process. Id., at 726-727.
We followed Rideau’s lead in two later cases in which media coverage manifestly tainted a criminal prosecution. In Estes v. Texas, 381 U. S. 532, 538 (1965), extensive public *380 ity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and “bombardjed]... the community with the sights and sounds of” the pretrial hearing. The media’s overzealous reporting efforts, we observed, “led to considerable disruption” and denied the “judicial serenity and calm to which [Billie Sol Estes] was entitled.” Id., at 536.
Similarly, in Sheppard v. Maxwell, 384 U. S. 333 (1966), news reporters extensively covered the story of Sam Sheppard, who was accused of bludgeoning his pregnant wife to death. “[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,” thrusting jurors “into the role of celebrities.” Id., at 353, 355. Pretrial media coverage, which we characterized as “months [of] virulent publicity about Sheppard and the murder,” did not alone deny due process, we noted. Id., at 354. But Sheppard’s case involved more than heated reporting pretrial: We upset the murder conviction because a “carnival atmosphere” pervaded the trial, id., at 358.
In each of these cases, we overturned a “conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage”; our decisions, however, “cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.” Murphy v. Florida, 421 U. S. 794, 798-799 (1975).[12] See also, e. g., Patton v. Yount, 467 *381 U. S. 1025 (1984).[13] Prominence does not necessarily produce prejudice, and juror impartiality, we have reiterated, does not require ignorance. Irvin v. Dowd, 366 U. S. 717, 722 (1961) (Jurors are not required to be “totally ignorant of the facts and issues involved”; “scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.”); Reynolds v. United States, 98 U. S. 145, 155-156 (1879) (“[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.”). A presumption of prejudice, our decisions indicate, attends only the extreme case.
3
Relying on Rideau, Estes, and Sheppard, Skilling asserts that we need not pause to examine the screening questionnaires or the voir dire before declaring his jury’s verdict void. We are not persuaded. Important differences sepa *382 rate Skilling’s prosecution from those in which we have presumed juror prejudice.[14]
First, we have emphasized in prior decisions the size and characteristics of the community in which the crime occurred. In Rideau, for example, we noted that the murder was committed in a parish of only 150,000 residents. Houston, in contrast, is the fourth most populous city in the Nation: At the time of Skilling’s trial, more than 4.5 million individuals eligible for jury duty resided in the Houston area. App. 627a. Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain. See Mu’Min v. Virginia, 500 U. S. 415, 429 (1991) (potential for prejudice mitigated by the size of the “metropolitan Washington [D. C.] statistical area, which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year”); Gentile v. State Bar of Nev., 501 U. S. 1030, 1044 (1991) (plurality opinion) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals).[15]
Second, although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight. Rideau’s dramati *383 eally staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it. Cf. Parker v. Randolph, 442 U. S. 62, 72 (1979) (plurality opinion) (“[T]he defendant’s own confession [is] probably the most probative and damaging evidence that can be admitted against him.” (internal quotation marks omitted)). Pretrial publicity about Skilling was less memorable and prejudicial. No evidence of the smoking-gun variety invited prejudgment of his culpability. See United States v. Chagra, 669 F. 2d 241, 251-252, n. 11 (CA5 1982) (“A jury may have difficulty in disbelieving or forgetting a defendant’s opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded.”).
Third, unlike cases in which trial swiftly followed a widely reported crime, e. g., Rideau, 373 U. S., at 724, over four years elapsed between Enron’s bankruptcy and Skilling’s trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron’s collapse. See App. 700a; id., at 785a; Yount, 467 U. S., at 1032, 1034.
Finally, and of prime significance, Skilling’s jury acquitted him of nine insider-trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government.[16] In Rideau, Estes, and Sheppard, in marked contrast, the jury’s verdict did not undermine in any way the supposition of juror bias. It would be odd for an appellate court to presume prejudice in a case in which jurors’ actions run counter to that presumption. See, e. g., United States v. Arzola-Amaya, 867 F. 2d 1504, 1514 *384 (CA5 1989) (“The jury’s ability to discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of [the] right to an impartial trial.”).
4
Skilling’s trial, in short, shares little in common with those in which we approved a presumption of juror prejudice. The Fifth Circuit reached the opposite conclusion based primarily on the magnitude and negative tone of media attention directed at Enron. But “pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial.” Nebraska Press Assn. v. Stuart, 427 U. S. 539, 554 (1976). In this case, as just noted, news stories about Enron did not present, the kind of vivid, unforgettable information we have recognized as particularly likely to produce prejudice, and Houston’s size and diversity diluted the media’s impact.[17]
Nor did Enron’s “sheer number of victims,” 554 F. 3d, at 560, trigger a presumption of prejudice. Although the widespread community impact necessitated careful identification and inspection of prospective jurors’ connections to Enron, the extensive screening questionnaire and followup voir dire were well suited to that task. And hindsight shows the efficacy of these devices; as we discuss infra, at 389-390, jurors’ links to Enron were either nonexistent or attenuated.
Finally, although Causey’s “well-publicized decision to plead guilty” shortly before trial created a danger of juror *385 prejudice, 554 F. 3d, at 559, the District Court took appropriate steps to reduce that risk. The court delayed the proceedings by two weeks, lessening the immediacy of that development. And during voir dire, the court asked about prospective jurors’ exposure to recent publicity, including news regarding Causey. Only two venire members recalled the plea; neither mentioned Causey by name, and neither ultimately served on Skilling’s jury. App. 888a, 993a. Although publicity about a codefendant’s guilty plea calls for inquiry to guard against actual prejudice, it does not ordinarily — and, we are satisfied, it did not here — warrant an automatic presumption of prejudice.
Persuaded that no presumption arose,[18] we conclude that the District Court, in declining to order a venue change, did not exceed constitutional limitations.[19]
B
We next consider whether actual prejudice infected Skilling’s jury. Voir dire, Skilling asserts, did not adequately detect and defuse juror bias. “[T]he record ... affirmatively confirmjs]” prejudice, he maintains, because several seated jurors “prejudged his guilt.” Brief for Petitioner 21. We disagree with Skilling’s characterization of the voir dire and the jurors selected through it.
*386 1
No hard-and-fast formula dictates the necessary depth or breadth of voir dire. See United States v. Wood, 299 U. S. 123, 145-146 (1936) (“Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.”). Jury selection, we have repeatedly emphasized, is “particularly within the province of the trial judge.” Ristaino v. Ross, 424 U. S. 589, 594-595 (1976) (internal quotation marks omitted); see, e. g., Mu’Min, 500 U. S., at 424; Yount, 467 U. S., at 1038; Rosales-Lopez v. United States, 451 U. S. 182, 188-189 (1981) (plurality opinion); Connors v. United States, 158 U. S. 408, 408-413 (1895).
When pretrial publicity is at issue, “primary reliance on the judgment of the trial court makes [especially] good sense” because the judge “sits in the locale where the publicity is said to have had its effect” and may base her evaluation on her “own perception of the depth and extent of news stories that might influence a juror.” Mu’Min, 500 U. S., at 427. Appellate courts making after-the-fact assessments of the media’s impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges.
Reviewing courts are properly resistant to second-guessing the trial judge’s estimation of a juror’s impartiality, for that judge’s appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record — among them, the prospective juror’s inflection, sincerity, demeanor, candor, body language, and apprehension of duty. See Reynolds, 98 U. S., at 156-157. In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member’s fitness for jury *387 service. We consider the adequacy of jury selection in Skilling’s case, therefore, attentive to the respect due to district-court determinations of juror impartiality and of the measures necessary to ensure that impartiality.[20]
2
Skilling deems the voir dire insufficient because, he argues, jury selection lasted “just five hours,” “[m]ost of the court’s questions were conclusory[,] high-level, and failed adequately to probe jurors’ true feelings,” and the court “consistently took prospective jurors at their word once they claimed they could be fair, no matter what other indications of bias were present.” Brief for Petitioner 10-11 (emphasis *388 deleted). Our review of the record, however, yields a different appraisal.[21]
As noted, supra, at 370-372, and n. 4, the District Court initially screened venire members by eliciting their responses to a comprehensive questionnaire drafted in large part by Skilling. That survey helped to identify prospective jurors excusable for 'cause and served as a springboard for further questions put to remaining members of the array. Voir dire thus was, in the court’s words, the “culmination of a lengthy process.” App. 841a; see 554 F. 3d, at 562, n. 51 (“We consider the . . . questionnaire in assessing the quality of voir dire as a whole.”).[22] In other Enron-related prose *389 cutions, we note, District Courts, after inspecting venire members’ responses to questionnaires, completed the jury-selection process within one day. See supra, at 374, n. 6.[23]
The District Court conducted voir dire, moreover, aware of the greater-than-normal need, due to pretrial publicity, to ensure against jury bias. At Skilling’s urging, the court examined each prospective juror individually, thus preventing the spread of any prejudicial information to other venire members. See Mu’Min, 500 U. S., at 425. To encourage candor, the court repeatedly admonished that there were “no right and wrong answers to th[e] questions.” E. g., App. 843a. The court denied Skilling’s request for attorney-led voir dire because, in its experience, potential jurors were “more forthcoming” when the court, rather than counsel, asked the question. Record 11805. The parties, however, were accorded an opportunity to ask followup questions of every prospective juror brought to the bench for colloquy. Skilling’s counsel declined to ask anything of more than half of the venire members questioned individually, including eight eventually selected for the jury, because, he explained, “the Court and other counsel have covered” everything he wanted to know. App. 967a.
Inspection of the questionnaires and voir dire of the individuals who actually served as jurors satisfies us that, notwithstanding the flaws Skilling lists, the selection process successfully secured jurors who were largely untouched by Enron’s collapse.[24] Eleven of the seated jurors and alter *390 nates reported no connection at all to Enron, while all other jurors reported at most an insubstantial link. See, e. g., Supp. App. lOlsa (Juror 63) (“I once met a guy who worked for Enron. I cannot remember his name.”).[25] As for pretrial publicity, 14 jurors and alternates specifically stated that they had paid scant attention to Enron-related news. See, e. g., App. 859a-860a (Juror 13) (would “[b]asically” start out knowing nothing about the case because “I just... didn’t follow [it] a whole lot”); id., at 969a (Juror 78) (“[Enron] wasn’t anything that I was interested in reading [about] in detail. ... I don’t really know much about it.”).[26] The re *391 maining two jurors indicated that nothing in the news influenced their opinions about Skilling.[27]
The questionnaires confirmed that, whatever community prejudice existed in Houston generally, Skilling’s jurors were not under its sway.[28] Although many expressed sympathy for victims of Enron’s bankruptcy and speculated that greed contributed to the corporation’s collapse, these sentiments did not translate into animus toward Skilling. When asked whether they “ha[d] an opinion about. . . Jeffrey Skilling,” none of the seated jurors and alternates checked the “yes” box.[29] And in response to the question whether “any opinion [they] may have formed regarding Enron or [Skil *392 ling] [would] prevent” their impartial consideration of the evidence at trial, every juror — despite options to mark “yes” or “unsure” — instead checked “no.”
The District Court, Skilling asserts, should not have “accepted] at face value jurors’ promises of fairness.” Brief for Petitioner 37. In Irvin v. Dowd, 366 U. S., at 727-728, Skilling points out, we found actual prejudice despite jurors’ assurances that they could be impartial. Brief for Petitioner 26. Justice Sotomayor, in turn, repeatedly relies on Irvin, which she regards as closely analogous to this case. See post, at 448 (dissent). See also, e. g., post, at 441-442, 458, 460, 464. We disagree with that characterization of Irvin.
The facts of Irvin are worlds apart from those presented here. Leslie Irvin stood accused of a brutal murder and robbery spree in a small rural community. 366 U. S., at 719. In the months before Irvin’s trial, “a barrage” of publicity was “unleashed against him,” including reports of his confessions to the slayings and robberies. Id., at 725-726. This Court’s description of the media coverage in Irvin reveals why the dissent’s “best case” is not an apt comparison:
“[S]tories revealed the details of [Irvin’s] background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but [he] refused to confess. Finally, they announced [Irvin’s] confession to the six murders and the fact of his indictment for four of them in Indiana. They reported [Irvin’s] offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that [Irvin] had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the *393 murders and the similarity noted). One story dramatically relayed the promise of a sheriff to devote his life to securing [Irvin’s] execution____ Another characterized [Irvin] as remorseless and without conscience but also as having been found sane by a court-appointed panel of doctors. In many of the stories [Irvin] was described as the ‘confessed slayer of six,’ a parole violator and fraudulent-check artist. [Irvin’s] court-appointed counsel was quoted as having received ‘much criticism over being Irvin’s counsel’ and it was pointed out, by way of excusing the attorney, that he would be subject to disbarment should he refuse to represent Irvin. On the day before the trial the newspapers carried the story that Irvin had orally admitted [to] the murder of [one victim] as well as ‘the robbery-murder of [a second individual]; the murder of [a third individual], and the slaughter of three members of [a different family].’” Ibid.
“[N]ewspapers in which the[se] stories appeared were delivered regularly to approximately 95% of the dwellings in” the county where the trial occurred, which had a population of only 30,000; “radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents.” Id., at 725.
Reviewing Irvin’s fair-trial claim, this Court noted that “the pattern of deep and bitter prejudice” in the community “was clearly reflected in the sum total of the voir dire”: “370 prospective jurors or almost 90% of those examined on the point... entertained some opinion as to guilt,” and “[8] out of the 12 [jurors] thought [Irvin] was guilty.” Id., at 727 (internal quotation marks omitted). Although these jurors declared they could be impartial, we held that, “[w]ith his life at stake, it is not requiring too much that [Irvin] be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of *394 the members admit, before hearing any testimony, to possessing a belief in his guilt.” Id., at 728.
In this ease, as noted supra, at 382-383, news stories about Enron contained nothing resembling the horrifying information rife in reports about Irvin’s rampage of robberies and murders. Of key importance, Houston shares little in common with the rural community in which Irvin’s trial proceeded, and circulation figures for Houston media sources were far lower than the 95% saturation level recorded in Irvin, see App. to Brief for United States 15a (“The Houston Chronicle . . . reaches less than one-third of occupied households in Houston.” (internal quotation marks omitted)). Skilling’s seated jurors, moreover, exhibited nothing like the display of bias shown in Irvin. See supra, at 389-392 (noting, inter alia, that none of Skilling’s jurors answered “yes” when asked if they “ha[d] an opinion about . . . Skilling”). See also post, at 444 (dissent) (distinguishing Mu’Min from Irvin on similar bases: the “offense occurred in [a large] metropolitan . . . area,” media “coverage was not as pervasive as in Irvin and did not contain the same sort of damaging information,” and “the seated jurors uniformly disclaimed having ever formed an opinion about the case” (internal quotation marks omitted)). In light of these large differences, the District Court had far less reason than did the trial court in Irvin to discredit jurors’ promises of fairness.
The District Court, moreover, did not simply take venire members who proclaimed their impartiality at their word.[30] As noted, all of Skilling’s jurors had already affirmed on their questionnaires that they would have no trouble basing *395 a verdict only on the evidence at trial. Nevertheless, the court followed up with each individually to uncover concealed bias. This face-to-face opportunity to gauge demeanor and credibility, coupled with information from the questionnaires regarding jurors’ backgrounds, opinions, and sources of news, gave the court a sturdy foundation to assess fitness for jury service. See 554 F. 3d, at 562 (The District Court made “thorough” credibility determinations that “requirted] more than just the [venire members’] statements that [they] could be fair.”). The jury’s not-guilty verdict on nine insider-trading counts after nearly five days of deliberation, meanwhile, suggests the court’s assessments were accurate. See United States v. Haldeman, 559 F. 2d 31, 60, n. 28 (CADC 1976). Skilling, we conclude, failed to show that his voir dire fell short of constitutional requirements.[31]
3
Skilling also singles out several jurors in particular and contends they were openly biased. See United States v. Martinez-Salazar, 528 U. S. 304, 316 (2000) (“[T]he seating of any juror who should have been dismissed for cause . . . *396 required] reversal.”)- In reviewing claims of this type, the deference due to district courts is at its pinnacle: “A trial court’s findings of juror impartiality may be overturned only for manifest error.” Mu’Min, 500 U. S., at 428 (internal quotation marks omitted). Skilling, moreover, unsuccessfully challenged only one of the seated jurors for cause, “strong evidence that he was convinced the [other] jurors were not biased and had not formed any opinions as to his guilt.” Beck v. Washington, 369 U. S. 541, 557-558 (1962). With these considerations in mind, we turn to Skilling’s specific allegations of juror partiality.
Skilling contends that Juror 11 — the only seated juror he challenged for cause — “expressed the most obvious bias.” Brief for Petitioner 35. See also post, at 460-461 (dissent). Juror 11 stated that “greed on Enron’s part” triggered the company's bankruptcy and that corporate executives, driven by avarice, “walk a line that stretches sometimes the legality of something.” App. 854a-855a. But, as the Fifth Circuit accurately summarized, Juror 11
“had ‘no idea’ whether Skilling had ‘crossed that line,’ and he ‘didn’t say that’ every CEO is probably a crook. He also asserted that he could be fair and require the government to prove its case, that he did not believe everything he read in the paper, that he did not ‘get into the details’ of the Enron coverage, that he did not watch television, and that Enron was ‘old news.’” 554 F. 3d, at 563-564.
Despite his criticism of greed, Juror 11 remarked that Skilling “earned [his] salar[y],” App. 857a, and said he would have “no problem” telling his co-worker, who had lost 401(k) funds due to Enron’s collapse, that the jury voted to acquit, if that scenario came to pass, id., at 854a. The District Court, noting that it had “looked [Juror 11] in the eye and ... heard all his [answers],” found his assertions of impartiality credible. Id., at 858a; cf. supra, at 394, n. 30. We agree with the *397 Court of Appeals that “[t]he express finding that Juror 11 was fair is not reversible error.” 554 F. 3d, at 564.[32]
Skilling also objected at trial to the seating of six specific jurors whom, he said, he would have excluded had he not already exhausted his peremptory challenges. See supra, at 374-375. Juror 20, he observes, “said she was 'angry’ about Enron’s collapse and that she, too, had been 'forced to forfeit [her] own 401(k) funds to survive layoffs.’” Reply Brief 13. But Juror 20 made clear during voir dire that she did not “personally blame” Skilling for the loss of her retirement account. App. 875a. Having not “pa[id] much attention” to Enron-related news, she “quite honestly” did not “have enough information to know” whether Skilling was probably guilty, id., at 873a, and she “th[ought] [she] could be” fair and impartial, id., at 875a. In light of these answers, the District Court did not commit manifest error in finding Juror 20 fit for jury service.
The same is true of Juror 63, who, Skilling points out, wrote on her questionnaire “that [Skilling] 'probably knew [he] w[as] breaking the law.’ ” Reply Brief 13. During voir dire, however, Juror 63 insisted that she did not “really have an opinion [about Skilling’s guilt] either way,” App. 936a; she did not “know what [she] was thinking” when she completed the questionnaire, but she “absolutely” presumed Skilling innocent and confirmed her understanding that the Government would “have to prove” his guilt, id., at 937a. In response to followup questions from Skilling’s counsel, she again stated she would not presume that Skilling violated any laws and could “[absolutely” give her word that she could be fair. Id., at 937a-938a. “Jurors,” we have recognized, “cannot be expected invariably to express themselves carefully or even consistently.” Yount, 467 U. S., at 1039. See also id., at 1040 (“It is here that the federal [appellate] *398 court’s deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty.”). From where we sit, we cannot conclude that Juror 68 was biased.
The four remaining jurors Skilling said he would have excluded with extra peremptory strikes exhibited no sign of prejudice we can discern. See App. 891a-892a (Juror 38) (remembered no media coverage about Enron and said nothing in her experience would prevent her from being fair and impartial); Supp. App.- 131sa-133sa, 136sa (Juror 67) (had no connection to Enron and no anger about its collapse); App. 969a (Juror 78) (did not “know much about” Enron); Supp. App. 165sa; App. 971a (Juror 84) (had not heard or read anything about Enron and said she did not “know enough to answer” the question whether she was angry about the company’s demise). Skilling’s counsel declined to ask followup questions of any of these jurors and, indeed, told Juror 84 he had nothing to ask because she “gave all the right answers.” Id., at 972a. Whatever Skilling’s reasons for wanting to strike these four individuals from his jury, he cannot credibly assert they displayed a disqualifying bias.[33]
In sum, Skilling failed to establish that a presumption of prejudice arose or that actual bias infected the jury that tried him. Jurors, the trial court correctly comprehended, need not enter the box with empty heads in order to determine the facts impartially. “It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a ver *399 diet based on the evidence presented in court.” Irvin, 366 U. S., at 723. Taking account of the full record, rather than incomplete exchanges selectively culled from it, we find no cause to upset the lower courts’ judgment that Skilling’s jury met that measure. We therefore affirm the Fifth Circuit’s ruling that Skilling received a fair trial.[34]
Ill
We next consider whether Skilling’s conspiracy conviction was premised on an improper theory of honest-services wire fraud. The honest-services statute, §1346, Skilling maintains, is unconstitutionally vague. Alternatively, he contends that his conduct does not fall within the statute’s compass.
A
To place Skilling’s constitutional challenge in context, we first review the origin and subsequent application of the honest-services doctrine.
1
Enacted in 1872, the original mail-fraud provision, the predecessor of the modern-day mail- and wire-fraud laws, proscribed, without farther elaboration, use of the mails to advance “any scheme or artifice to defraud.” See McNally v. United States, 483 U. S. 350, 356 (1987) (internal quotation marks omitted). In 1909, Congress amended the statute to prohibit, as it does today, “any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. ” § 1341 *400 (emphasis added); see id., at 357-358. Emphasizing Congress’ disjunctive phrasing, the Courts of Appeals, one after the other, interpreted the term “scheme or artifice to defraud” to include deprivations not only of money or property, but also of intangible rights.
In an opinion credited with first presenting the intangible-rights theory, Shushan v. United States, 117 F. 2d 110 (1941), the Fifth Circuit reviewed the mail-fraud prosecution of a public official who allegedly accepted bribes from entrepreneurs in exchange for urging city action beneficial to the bribe payers. “It is not true that because the [city] was to make and did make a saving by the operations there could not have been an intent to defraud,” the Court of Appeals maintained. Id., at 119. “A scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official,” the court observed, “would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public.” Id., at 115.
The Fifth Circuit’s opinion in Shushan stimulated the development of an “honest-services” doctrine. Unlike fraud in which the victim’s loss of money or property supplied the defendant’s gain, with one the mirror image of the other, see, e. g., United States v. Starr, 816 F. 2d 94, 101 (CA2 1987), the honest-services theory targeted corruption that lacked similar symmetry. While the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment. For example, if a city mayor (the offender) accepted a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm’s length, the city (the betrayed party) would suffer no tangible loss. Cf. McNally, 483 U. S., at 360. Even if the scheme occasioned a money or property gain for the betrayed party, courts reasoned, actionable harm lay in the denial of that party’s right to the offender’s “honest services.” See, e. g., United States v. Dixon, 536 F. 2d 1388, 1400 (CA2 1976).
*401 “Most often these cases ... involved bribery of public officials,” United States v. Bohonus, 628 F. 2d 1167, 1171 (CA9 1980), but courts also recognized private-sector honest-services fraud. In perhaps the earliest application of the theory to private actors, a District Court, reviewing a bribery scheme, explained:
“When one tampers with [the employer-employee] relationship for the purpose of causing the employee to breach his duty [to his employer,] he in effect is defrauding the employer of a lawful right. The actual deception that is practised is in the continued representation of the employee to the employer that he is honest and loyal to the employer’s interests.” United States v. Procter & Gamble Co., 47 F. Supp. 676, 678 (Mass. 1942).
Over time, “[a]n increasing number of courts” recognized that “a recreant employee” — public or private — “c[ould] be prosecuted under [the mail-fraud statute] if he breache[d] his allegiance to his employer by accepting bribes or kickbacks in the course of his employment,” United States v. McNeive, 536 F. 2d 1245, 1249 (CA8 1976); by 1982, all Courts of Appeals had embraced the honest-services theory of fraud, Hurson, Limiting the Federal Mail Fraud Statute — A Legislative Approach, 20 Am. Crim. L. Rev. 423, 456 (1983).[35]
2
In 1987, this Court, in McNally v. United States, stopped the development of the intangible-rights doctrine in its tracks. McNally involved a state officer who, in selecting Kentucky’s insurance agent, arranged to procure a share of the agent’s commissions via kickbacks paid to companies the *402 official partially controlled. 483 U. S., at 360. The prosecutor did not charge that, “in the absence of the alleged scheme[,] the Commonwealth would have paid a lower premium or secured better insurance.” Ibid. Instead, the prosecutor maintained that the kickback scheme “defraud[ed] the citizens and government of Kentucky of their right to have the Commonwealth’s affairs conducted honestly.” Id., at 353.
We held that the scheme did not qualify as mail fraud. “Rather than construing] the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials,” we read the statute “as limited in scope to the protection of property rights.” Id., at 360. “If Congress desires to go further,” we stated, “it must speak more clearly.” Ibid.
3
Congress responded swiftly. The following year, it enacted a new statute “specifically to cover one of the 'intangible rights’ that lower courts had protected . . . prior to McNally: the intangible right of honest services.’” Cleveland v. United States, 531 U. S. 12, 19-20 (2000). In full, the honest-services statute stated:
“For the purposes of th[e] chapter [of the United States Code that prohibits, inter alia, mail fraud, § 1341, and wire fraud, § 1343], the term 'scheme or artifice to defraud’ includes a scheme or artifice to deprive another of the intangible right of honest services.” § 1346.
B
Congress, Skilling charges, reacted quickly but not clearly: He asserts that § 1346 is unconstitutionally vague. To satisfy due process, “a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discrimina *403 tory enforcement.” Kolender v. Lawson, 461 U. S. 352, 357 (1983). The void-for-vagueness doctrine embraces these requirements.
According to Skilling, § 1346 meets neither of the two due process essentials. First, the phrase “the intangible right of honest services,” he contends, does not adequately define what behavior it bars. Brief for Petitioner 38-39. Second, he alleges, § 1346’s “standardless sweep... allows policemen, prosecutors, and juries to pursue their personal predilections,” thereby “faeilitat[ing] opportunistic and arbitrary prosecutions.” Id., at 44 (quoting Kolender, 461 U. S., at 358).
In urging invalidation of § 1346, Skilling swims against our case law’s current, which requires us, if we can, to construe, not condemn, Congress’ enactments. See, e. g., Civil Service Comm’n v. Letter Carriers, 413 U. S. 548, 571 (1973). See also United States v. National Dairy Products Corp., 372 U. S. 29, 32 (1963) (stressing, in response to a vagueness challenge, “[t]he strong presumptive validity that attaches to an Act of Congress”). Alert to § 1346’s potential breadth, the Courts of Appeals have divided on how best to interpret the statute.[36] Uniformly, however, they have declined to throw out the statute as irremediably vague.[37]
*404 We agree that § 1346 should be construed rather than invalidated. First, we look to the doctrine developed in preMcNally cases in an endeavor to ascertain the meaning of the phrase “the intangible right of honest services.” Second, to preserve what Congress certainly intended the statute to cover, we pare that body of precedent down to its core: In the main, the pre-McNally cases involved fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived. Confined to these paramount applications, § 1346 presents no vagueness problem.
1
There is no doubt that Congress intended § 1346 to refer to and incorporate the honest-services doctrine recognized in Courts of Appeals’ decisions before McNally derailed the intangible-rights theory of fraud. See Brief for Petitioner 39; Brief for United States 37-38; post, at 416, 422 (Scalia, J., concurring in part and concurring in judgment). Congress enacted § 1346 on the heels of McNally and drafted the statute using that decision’s terminology. See 483 U. S., at 355 (“intangible righ[t]”); id., at 362 (Stevens, J., dissenting) (“right to . . . honest services”).[38] As the Second Circuit observed in its leading analysis of § 1346:
“The definite article 'the’ suggests that 'intangible right of honest services’ had a specific meaning to Congress when it enacted the statute — Congress was recriminalizing mail- and wire-fraud schemes to deprive others *405 of that 'intangible right of honest services,’ which had been protected before McNally, not all intangible rights of honest services whatever they might be thought to be.” United States v. Rybicki, 354 F. 3d 124, 137-138 (2003) (en banc).[39]
2
Satisfied that Congress, by enacting § 1346, “meant to reinstate the body of pre-McNally honest-services law,” post, at 422 (opinion of Scalia, J.), we have surveyed that case law. See infra, at 407-408,410. In parsing the Courts of Appeals decisions, we acknowledge that Skilling’s vagueness challenge has force, for honest-services decisions preceding Mc-Nally were not models of clarity or consistency. See Brief for Petitioner 39-42 (describing divisions of opinions). See also post, at 417-420 (opinion of Scalia, J.). While the honest-services cases preceding McNally dominantly and consistently applied the fraud statute to bribery and kickback schemes — schemes that were the basis of most honest-services prosecutions — there was considerable disarray over the statute’s application to conduct outside that core category. In light of this disarray, Skilling urges us, as he urged the Fifth Circuit, to invalidate the statute in toto. Brief for Petitioner 48 (Section 1346 “is intolerably and unconstitutionally vague.”); Brief for Defendant-Appellant Skilling in No. 06-20885 (CA5), p. 65, n. 21 (“[Section 1346 should be invalidated as unlawfully vague on its face.”).
It has long been our practice, however, before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction. See, *406 e. g., Hooper v. California, 155 U. S. 648, 657 (1895) (“The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.” (emphasis added)). See also Boos v. Barry, 485 U. S. 312, 330-331 (1988); Schneider v. Smith, 390 U. S. 17, 26 (1968).[40] We have accordingly instructed “the federal courts ... to avoid constitutional difficulties by [adopting a limiting interpretation] if such a construction is fairly possible.” Boos, 485 U. S., at 331; see United States v. Harriss, 347 U. S. 612, 618 (1954) (“[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague .... And if this general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction.”).
Arguing against any limiting construction, Skilling contends that it is impossible to identify a salvageable honest-services core; “the pre-McNally caselaw,” he asserts, “is a *407 hodgepodge of oft-conflicting holdings” that are “hopelessly unclear.” Brief for Petitioner 39 (some capitalization and italics omitted). We have rejected an argument of the same tenor before. In Civil Service Comm’n v. Letter Carriers, federal employees challenged a provision of the Hatch Act that incorporated earlier decisions of the United States Civil Service Commission enforcing a similar law. “[T]he several thousand adjudications of the Civil Service Commission,” the employees maintained, were “an impenetrable jungle” — “undiscoverable, inconsistent, [and] incapable of yielding any meaningful rules to govern present or future conduct.” 413 U. S., at 571. Mindful that “our task [wa]s not to destroy the Act if we c[ould], but to construe it,” we held that “the rules that had evolved over the years from repeated adjudications were subject to sufficiently clear and summary statement.” Id., at 571-572.
A similar observation may be made here. Although some . applications of the pre-McNally honest-services doctrine occasioned disagreement among the Courts of Appeals, these cases do not cloud the doctrine’s solid core: The “vast majority” of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes. United States v. Runnels, 833 F. 2d 1183, 1187 (CA6 1987); see Brief for United States 42, and n. 4 (citing dozens of examples).[41] Indeed, the McNally case itself, which spurred Congress to enact §1346, presented a paradigmatic kickback fact pattern. 483 U. S., at 352-353, *408 360. Congress’ reversal of McNally and reinstatement of the honest-services doctrine, we conclude, can and should be salvaged by confining its scope to the core pr e-McNally applications.
As already noted, supra, at 400-401, the honest-services doctrine had its genesis in prosecutions involving bribery allegations. See Shushan, 117 F. 2d, at 115 (public sector); Procter & Gamble Co., 47 F. Supp., at 678 (private sector). See also United States v. Orsburn, 525 F. 3d 543, 546 (CA7 2008). Both before McNally and after § 1346’s enactment, Courts of Appeals described schemes involving bribes or kickbacks as “core . . . honest services fraud precedents,” United States v. Czubinski, 106 F. 3d 1069, 1077 (CA1 1997); “paradigm case[s],” United States v. deVegter, 198 F. 3d 1324, 1327-1328 (CA11 1999); “[t]he most obvious form of honest services fraud,” United States v. Carbo, 572 F. 3d 112, 115 (CA3 2009); “core misconduct covered by the statute,” United States v. Urciuoli, 513 F. 3d 290, 294 (CA1 2008); “most [of the] honest services cases,” United States v. Sorich, 523 F. 3d 702, 707 (CA7 2008); “typical,” United States v. Brown, 540 F. 2d 364, 374 (CA8 1976); “clear-cut,” United States v. Mandel, 591 F. 2d 1347, 1363 (CA4 1979); and “uniformly . . . cover[ed],” United States v. Paradies, 98 F. 3d 1266, 1283, n. 30 (CA11 1996). See also Tr. of Oral Arg. 43 (counsel for the Government) (“[T]he bulk of pr e-McNally honest services cases” entailed bribes or kickbacks); Brief for Petitioner 49 (“Bribes and kickbacks were the paradigm [pre-McNally] cases,” constituting “[t]he overwhelming majority of prosecutions for honest-services fraud.”).
In view of this history, there is no doubt that Congress intended §1346 to reach at least bribes and kickbacks. Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine.[42] To preserve the *409 statute without transgressing constitutional limitations, we now hold that §1346 criminalizes only the bribe-and-kickback core of the pre-McNally case law.[43]
3
The Government urges us to go further by locating within §1346’s compass another category of proscribed conduct: “undisclosed self-dealing by a public official or private employee — i. e., the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty.” Brief for United States 43-44. “[T]he *410 theory of liability in McNally itself was nondisclosure of a conflicting financial interest,” the Government observes, and “Congress clearly intended to revive th[at] nondisclosure theory.” Id., at 44. Moreover, “[although not as numerous as the bribery and kickback cases,” the Government asserts, “the pr e-McNally cases involving undisclosed self-dealing were abundant.” Ibid.
Neither of these contentions withstands close inspection. McNally, as we have already observed, supra, at 401-402, 407, involved a classic kickback scheme: A public official, in exchange for routing Kentucky’s insurance business through a middleman company, arranged for that company to share its commissions with entities in which the official held an interest. 483 U. S., at 352-353, 360. This was no mere failure to disclose a conflict of interest; rather, the official conspired with a third party so that both would profit from wealth generated by public contracts. See id., at 352-353. Reading § 1346 to proscribe bribes and kickbacks — and nothing more — satisfies Congress’ undoubted aim to reverse McNally on its facts.
Nor are we persuaded that the pre-McNally conflict-of-interest cases constitute core applications of the honest-services doctrine. Although the Courts of Appeals upheld honest-services convictions for “some schemes of nondisclosure and concealment of material information,” Mandel, 591 F. 2d, at 1361, they reached no consensus on which schemes qualified. In light of the relative infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges, and the intercircuit inconsistencies they produced, we conclude that a reasonable limiting construction of § 1346 must exclude this amorphous category of cases.
Further dispelling doubt on this point is the familiar principle that “ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.” Cleveland, 531 U. S., at 25 (quoting Rewis v. United States, 401 U. S. 808, *411 812 (1971)). “This interpretive guide is especially appropriate in construing [§ 1346] because ... mail [and wire] fraud [are] predicate offense[s] under [the Racketeer Influenced and Corrupt Organizations Act], 18 U. S. C. § 1961(1) (1994 ed., Supp. IY), and the money laundering statute, § 1956(c) (7)(A).” Cleveland, 531 U. S., at 25. Holding that honest-services fraud does not encompass conduct more wide ranging than the paradigmatic cases of bribes and kickbacks, we resist the Government’s less constrained construction absent Congress’ clear instruction otherwise. E. g., United States v. Universal C. I. T Credit Corp., 344 U. S. 218, 221-222 (1952).
In sum, our construction of § 1346 “establishes] a uniform national standard, define[s] honest services with clarity, reach[es] only seriously culpable conduct, and accomplishes] Congress’s goal of ‘overruling’ McNally.” Brief for Albert W. Alschuler as Amicus Curiae in Weyhrauch v. United States, O. T. 2009, No. 08-1196, pp. 28-29. “If Congress desires to go further,” we reiterate, “it must speak more clearly than it has.” McNally, 483 U. S., at 360.[44]
*412 4
Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague. Recall that the void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions. See Kolender, 461 U. S., at 357. A prohibition on fraudulently depriving another of one’s honest services by accepting bribes or kickbacks does not present a problem on either score.
As to fair notice, “whatever the school of thought concerning the scope and meaning of” §1346, it has always been “as plain as a pikestaff that” bribes and kickbacks constitute honest-services fraud, Williams v. United States, 341 U. S. 97, 101 (1951), and the statute’s mens rea requirement further blunts any notice concern, see, e. g., Screws v. United States, 325 U. S. 91, 101-104 (1945) (plurality opinion). See also Broadrick v. Oklahoma, 413 U. S. 601, 608 (1973) (“[E]ven if the outermost boundaries of [a statute are] imprecise, any such uncertainty has little relevance . . . where appellants’ conduct falls squarely within the 'hard core’ of the statute’s proscriptions.”). Today’s decision clarifies that no other misconduct falls within § 1346’s province. See United States v. Lanier, 520 U. S. 259, 266 (1997) (“[C]larity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute.”).
As to arbitrary prosecutions, we perceive no significant risk that the honest-services statute, as we interpret it today, will be stretched out of shape. Its prohibition on bribes and kickbacks draws content not only from the preMcNally case law, but also from federal statutes proscribing — and defining — similar crimes. See, e. g., 18 U. S. C. §§ 201(b), 666(a)(2); 41 U. S. C. §52(2) (“The term 'kickback’ means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining or rewarding favor *413 able treatment in connection with [enumerated circumstances].”).[45] See also, e. g., United States v. Ganim, 510 F. 3d 134, 147-149 (CA2 2007) (Sotomayor, J.) (reviewing honest-services conviction involving bribery in light of elements of bribery under other federal statutes); United States v. Whitfield, 590 F. 3d 325, 352-353 (CA5 2009); United States v. Kemp, 500 F. 3d 257, 281-286 (CA3 2007). A criminal defendant who participated in a bribery or kickback scheme, in short, cannot tenably complain about prosecution under § 1346 on vagueness grounds.
C
It remains to determine whether Skilling’s conduct violated § 1346. Skilling’s honest-services prosecution, the Government concedes, was not “prototypical.” Brief for United States 49. The Government charged Skilling with conspiring to defraud Enron’s shareholders by misrepresenting the company’s fiscal health, thereby artificially inflating its stock price. It was the Government’s theory at trial that Skilling “profited from the fraudulent scheme . . . through the receipt of salary and bonuses, . . . and through the sale of approximately $200 million in Enron stock, which netted him $89 million.” Id., at 51.
The Government did not, at any time, allege that Skilling solicited or accepted side payments from a third party in exchange for making these misrepresentations. See Record 41328 (May 11, 2006 Letter from the Government to the District Court) (“[T]he indictment does not allege, and the government’s evidence did not show, that [Skilling] engaged in bribery.”). It is therefore clear that, as we read § 1346, Skilling did not commit honest-services fraud.
*414 Because the indictment alleged three objects of the conspiracy — honest-services wire fraud, money-or-property wire fraud, and securities fraud — Skilling’s conviction is flawed. See Yates v. United States, 354 U. S. 298 (1957) (constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory). This determination, however, does not necessarily require reversal of the conspiracy conviction; we recently confirmed, in Hedgpeth v. Pulido, 555 U. S. 57 (2008) (per curiam), that errors of the Yates variety are subject to harmless-error analysis. The parties vigorously dispute whether the error was harmless. Compare Brief for United States 52 (“[A]ny juror who voted for conviction based on [the honest-services theory] also would have found [Skilling] guilty of conspiring to commit securities fraud.”) with Reply Brief 30 (The Government “cannot show that the conspiracy conviction rested only on the securities-fraud theory, rather than the distinct, legally-flawed honest-services theory.”). We leave this dispute for resolution on remand.[46]
Whether potential reversal on the conspiracy count touches any of Skilling’s other convictions is also an open question. All of his convictions, Skilling contends, hinged on the conspiracy count and, like dominoes, must fall if it falls. The District Court, deciding Skilling’s motion for bail pending appeal, found this argument dubious, App. 1141a-1142a, but the Fifth Circuit had no occasion to rule on it. That court may do so on remand.
*415 * * *
For the foregoing reasons, we affirm the Fifth Circuit’s ruling on Skilling’s fair-trial argument, vacate its ruling on his conspiracy conviction, and remand the case for proceedings consistent with this opinion.

It is so ordered.

 The mail- and wire-fraud statutes criminalize the use of the mails or wires in furtherance of “any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.” 18 U. S. C. § 1341 (mail fraud); § 1343 (wire fraud). The honest-services statute, § 1346, defines “the term ‘scheme or artifice to defraud’ ” in these provisions to include “a scheme or artifice to deprive another of the intangible right of honest services.”

 See United States v. Fastow, 292 F. Supp. 2d 914, 918 (SD Tex. 2003); Order in United States v. Hirko, No. 4:03-cr-00093 (SD Tex., Nov. 24, 2004), Record, Doc. 484, p. 6. These rulings were made by two other judges of the same District. Three judges residing in the area thus independently found that defendants in Enron-related cases could obtain a fair trial in Houston.

 Painting a different picture of the media coverage surrounding Enron’s collapse, Justice Sotomayor’s opinion relies heavily on affidavits of media experts and jury consultants submitted by Skilling in support of his venue-transfer motion. E. g., post, at 428, 429-430, 431 (opinion concurring in part and dissenting in part) (hereinafter dissent); post, at 431, n. 2, and 448, n. 10; post, at 451, and 459-460, n. 22. These Skillingemployed experts selected and emphasized negative statements in various news stories. But the District Court Judge did not find the experts’ samples representative of the coverage at large; having “[m]etieul'ous[ly] review[ed] all of the evidence” Skilling presented, the court concluded that “incidents [of news reports using] less-than-objeetive language” were dwarfed by “the largely fact-based tone of most of the articles.” App. to Brief for United States 7a, 10a, 11a. See also post, at 429 (acknowledging that “many of the stories were straightforward news items”).

 Questions included the following: “What are your opinions about the compensation that executives of large corporations receive?”; “Have you, any family members, or friends ever worked for or applied for work with,” “done business with,” or “owned stock in Enron Corporation or any Enron subsidiaries and partnership?”; “Do you know anyone . . . who has been negatively affected or hurt in any way by what happened at Enron?”; “Do you have an opinion about the cause of the collapse of Enron? If YES, what is your opinion? On what do you base your opinion?”; “Have you heard or read about any of the Enron cases? If YES, please tell us the name of all sources from which you have heard or read about the Enron cases.”; “Have you read any books or seen any movies about Enron? If YES, please describe.”; “Are you angry about what happened with Enron? If YES, please explain.”; “Do you have an opinion about... Jeffrey Skilling ...[?] If YES, what is your opinion? On what do you base your *372 opinion?”; “Based on anything you have heard, read, or been told[,] do you have any opinion about the guilt or innocence of... Jeffrey Skilling!?] If ... YES ..., please explain.”; “[W]ould any opinion you may have formed regarding Enron or any of the defendants prevent you from impartially considering the evidence presented during the trial of . . . Jeffrey Skilling!?] If YES or UNSURE . . . , please explain.”; “Is there anything else you feel is important for the court to know about you?” Record 13013-13026.

 Among other questions, the court asked whether sympathy toward the victims of Enron’s collapse or a desire to see justice done would overpower prospective jurors’ impartiality. App. 839a-840a.

 Selection procedures of similar style and duration took place in three Enron-related criminal cases earlier prosecuted in Houston — United States v. Arthur Andersen LLP, No. 4:02-cr-00121-l (SD Tex.) (charges against Enron’s outside accountants); United States v. Bayly, No. 4:03-cr-00363 (SD Tex.) (charges against Merrill Lynch and Enron executives for alleged sham sales of Nigerian barges); United States v. Hirko, No. 4:03-cr-00093 (SD Tex.) (fraud and insider-trading charges against five Enron Broadband Services executives). See Brief for United States 9 (In all three cases, the District Court “distributed a jury questionnaire to a pool of several hundred potential jurors; dismissed individuals whose responses to the questionnaire demonstrated bias or other disqualifying characteristics; and, after further questioning by the court and counsel, selected a jury from the remaining venire in one day.”); Government’s Memorandum of Law in Response to Defendants’ Joint Motion to Transfer Venue in United States v. Skilling, No. 4:04-cr-00025 (SD Tex., Dec. 3, 2004), Record, Doc. 231, pp. 21-28 (describing in depth the jury-selection process in the Arthur Andersen and Bayly trials).

 Skilling had requested an additional peremptory strike each time the District Court rejected a for-cause objection. The court, which had already granted two extra peremptories, see swpra, at 373, denied each request.

 The Fifth Circuit described the media coverage as follows:
“Local newspapers ran many personal interest stories in which sympathetic individuals expressed feelings of anger and betrayal toward Enron.... Even the [Houston] Chronicle’s sports page wrote of Skilling’s guilt as a foregone conclusion. Similarly, the Chronicle’s ‘Pethouse Pet of the Week’ section mentioned that a pet had ‘enjoyed watching those Enron jerks being led away in handcuffs.’ These are but a few examples of the Chronicle’s coverage.” 554 F. 3d, at 559 (footnote omitted).

 We also granted certiorari and heard arguments this Term in two other cases raising questions concerning the honest-services statute’s scope. See Black v. United States, No. 08-876; Weyhrauch v. United States, No. 08-1196. Today we vacate and remand those decisions in light of this opinion. Black, post, p. 465; Weyhrauch, post, p. 476.

 Assuming, as the Fifth Circuit found, that a presumption of prejudice arose in Houston, the question presented in Skilling’s petition for certiorari casts his actual-prejudice argument as an inquiry into when, if ever, that presumption may be rebutted. See Pet. for Cert. i. Although we find a presumption of prejudice unwarranted in this case, we consider the actual-prejudice issue to be fairly subsumed within the question we agreed to decide. See this Court’s Rule 14.1(a).

 Venue transfer in federal court is governed by Federal Rule of Criminal Procedure 21, which instructs that a “court must transfer the proceeding ... to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.” As the language of the Rule suggests, district-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect. See Platt v. Minnesota Mining & Mfg. Co., 376 U. S. 240, 245 (1964). Federal courts have invoked the Rule to move certain highly charged cases, for example, the prosecution arising from the bombing of the Alfred P. Murrah Federal Office Building in Oklahoma City. See United States v. McVeigh, 918 F. Supp. 1467, 1474 (WD Okla. 1996). They have also exercised discretion to deny venue-transfer requests in cases involving substantial pretrial publicity and community impact, for example, the prosecutions resulting from the 1993 World Trade Center bombing, see United States v. Salameh, No. S5 93 Cr. 0180 (KTD) (SDNY, Sept. 15,1993); United States v. Yousef, No. S12 93 Cr. 180 (KTD) (SDNY, July 18, 1997), aff’d 327 F. 3d 56, 155 (CA2 2003), and the prosecution of John Walker Lindh, referred to in the press as the American Taliban, see United States v. Lindh, 212 F. Supp. 2d 541, 549-551 (ED Va. 2002). Skilling does not argue, distinct from his due process challenge, that the District Court abused its discretion under Rule 21 by declining to move his trial. We therefore review the District Court’s venue-transfer decision only for compliance with the Constitution.

 Murphy involved the robbery prosecution of the notorious Jack Murphy, a convicted murderer who helped mastermind the 1964 heist of the Star of India sapphire from New York’s American Museum of Natural History. Pointing to “extensive press coverage” about him, Murphy moved to transfer venue. 421 U. S., at 796. The trial court denied the motion, and a jury convicted Murphy. We affirmed. Murphy’s trial, we explained, was markedly different from the proceedings at issue in Rideau v. Louisiana, 373 U. S. 723 (1963), Estes v. Texas, 381 U. S. 532 (1965), and Sheppard v. Maxwell, 384 U. S. 333 (1966), which “entirely lack[ed]... the solemnity and sobriety to which a defendant is entitled in a system that *381 subscribes to any notion of fairness and rejects the verdict of a mob.” 421 U. S., at 799. Voir dire revealed no great hostility toward Murphy; “[s]ome of the jurors had a vague recollection of the robbery with which [he] was charged and each had some knowledge of [his] past crimes, but none betrayed any belief in the relevance of [his] past to the present case.” Id., at 800 (footnote omitted).

 In Yount, the media reported on Jon Yount’s confession to a brutal murder and his prior conviction for the crime, which had been reversed due to a violation of Miranda v. Arizona, 384 U. S. 436 (1966). During voir dire, 77% of prospective jurors acknowledged they would carry an opinion into the jury box, and 8 of the 14 seated jurors and alternates admitted they had formed an opinion as to Yount’s guilt. 467 U. S., at 1029-1030. Nevertheless, we rejected Yount’s presumption-of-prejudiee claim. The adverse publicity and community outrage, we noted, were at their height prior to Yount’s first trial, four years before the second prosecution; time had helped “sooth[e] and eras[e]” community prejudice, id., at 1034.

 Skilling’s reliance on Estes and Sheppard is particularly misplaced; those cases involved media interference with courtroom proceedings during trial. See supra, at 379-380. Skilling does not assert that news coverage reached and influenced his jury after it was empaneled.

 According to a survey commissioned by Skilling in conjunction with his first motion for a venue change, only 12.3% of Houstonians named him when asked to list Enron executives they believed guilty of crimes. App. 375a-376a. In response to the followup question “[w]hat words come to mind when you hear the name Jeff Skilling?”, two-thirds of respondents failed to say a single negative word, id., at 376a: 43% either had never heard of Skilling or stated that nothing came to mind when they heard his name, and another 23% knew Skilling’s name was associated with Enron but reported no opinion about him, Record 3210-3211; see App. 417a-492a.

 As the United States summarizes, “[I]n Hirko, the jury deliberated for several days and did not convict any Enron defendant; in Bayly, which was routinely described as ‘the first Enron criminal trial/ the jury convicted five defendants, . . . but acquitted a former Enron executive. At the sentencing phase of Bayly, the jury found a loss amount of slightly over $13 million, even though the government had argued that the true loss ... was $40 million.” Brief for United States 9-10 (citation omitted).

 The Fifth Circuit, moreover, did not separate media attention aimed at Skilling from that devoted to Enron’s downfall more generally. Data submitted by Skilling in support of his first motion for a venue transfer suggested that a slim percentage of Enron-related stories specifically named him. App. 572a. “[Wjhen publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact.” United States v. Hueftle, 687 F. 2d 1305, 1310 (CA10 1982).

 The parties disagree about whether a presumption of prejudice can be rebutted, and, if it can, what standard of proof governs that issue. Compare Brief for Petitioner 25-35 with Brief for United States 24-32, 35-36. Because we hold that no presumption arose, we need not, and do not, reach these questions.

 The dissent acknowledges that “the prospect of seating an unbiased jury in Houston was not so remote as to compel the conclusion that the District Court acted unconstitutionally in denying Skilling’s motion to change venue.” Post, at 445. The dissent’s conclusion that Skilling did not receive a fair trial accordingly turns on its perception of the adequacy of the jury-selection process.

 The dissent recognizes “the 'wide discretion’ owed to trial courts when it comes to jury-related issues,” post, at 447 (quoting Mu’Min v. Virginia, 500 U. S. 415, 427 (1991)), but its analysis of the District Court’s voir dire sometimes fails to demonstrate that awareness. For example, the dissent faults the District Court for not questioning prospective jurors regarding their “knowledge of or feelings about” Causey’s guilty plea. Post, at 453. But the court could reasonably decline to ask direct questions involving Causey’s plea to avoid tipping off until-that-moment uninformed venire members that the plea had occurred. Cf. App. 822a (counsel for Skilling urged District Court to find a way to question venire members about Causey “without mentioning anything”). Nothing inhibited defense counsel from inquiring about venire members’ knowledge of the plea; indeed, counsel posed such a question, id., at 993a; cf. post, at 453, n. 14 (acknowledging that counsel “squeeze[d] in” an inquiry whether a venire member had “read about any guilty pleas in this ease over the last month or two” (internal quotation marks omitted)). From this Court’s lofty and “panoramic” vantage point, post, at 447, lines of voir dire inquiry that “might be helpful in assessing whether a juror is impartial” are not hard to conceive. Mu’Min, 500 U. S., at 425. “To be constitutionally compelled, however, it is not enough that such questions might be helpful. Eather, the trial court’s failure to ask these questions must render the defendant’s trial fundamentally unfair.” Id., at 425-426. According appropriate deference to the District Court, we cannot characterize jury selection in this ease as fundamentally unfair. Cf. supra, at 374, n. 6 (same selection process was used in other Enron-related prosecutions).

 In addition to focusing on the adequacy of voir dire, our decisions have also “take[n] into account.. . other measures [that] were used to mitigate the adverse effects of publicity.” Nebraska Press Assn. v. Stuart, 427 U. S. 539, 565 (1976). We have noted, for example, the prophylactic effect of “emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court.” Id., at 564. Here, the District Court’s instructions were unequivocal; the jurors, the court emphasized, were dutybound “to reach a fair and impartial verdict in this case based solely on the evidence [they] hear[d] and read in th[e] courtroom.” App. 1026a. Peremptory challenges, too, “provid[e] protection against [prejudice],” United States ex rel. Darcy v. Handy, 351 U. S. 454, 462 (1956); the District Court, as earlier noted, exercised its discretion to grant the defendants two extra peremptories, App. 1020a; see swpra, at 373.

 The dissent’s analysis undervalues the 77-item questionnaire, a part of the selection process difficult to portray as “cursory,” post, at 455, or “anemic,” post, at 460. Notably, the “open-ended questions about [prospective jurors’] impressions of Enron or Skilling” that the dissent contends should have been asked, post, at 455, were asked — on the questionnaire, see supra, at 371-372, n. 4. Moreover, the District Court gave Skilling’s counsel relatively free rein to ask venire members about their responses on the questionnaire. See, e. g., App. 869a-870a; id., at 878a, 911a, 953a. The questionnaire plus followup opportunity to interrogate potential jurors surely gave Skilling’s counsel “clear avenue[s] for . . . permissible inquiry.” But see post, at 456, n. 17. See also App. 967a (counsel for Skilling) (“Judge, for the record, if I don’t ask any questions, it’s because the Court and other counsel have covered it.”).

 One of the earlier prosecutions targeted the “Big Five” public accounting firm Arthur Andersen. See supra, at 374, n. 6. Among media readers and auditors, the name and reputation of Arthur Andersen likely-sparked no less attention than the name and reputation of Jeffrey Skilling. Cf. supra, at 382, n. 15.

 In considering whether Skilling was tried before an impartial jury, the dissent relies extensively on venire members not selected for that jury. See, e. g., post, at 432, n. 4 (quoting the questionnaires of 10 venire members; all were excused for cause before voir dire commenced, see Record 11891); post, at 433, n. 6 (quoting the questionnaires of 15 venire members; *390 none sat on Skilling’s jury); post, at 436, n. 7 (quoting voir dire testimony of 6 venire members; none sat on Skilling’s jury); post, at 453-458 (reporting at length voir dire testimony of Venire Members 17, 29, 61, 74, 75, and 101; none sat on Skilling’s jury). Statements by nonjurors do not themselves call into question the adequacy of the jury-selection process; elimination of these venire members is indeed one indicator that the process fulfilled its function. Critically, as discussed infra, at 391-392, the seated jurors showed little knowledge of or interest in, and were personally unaffected by, Enron’s downfall.

 See also Supp. App. lisa (Juror 10) (“knew some casual co-workers that owned Enron stock”); id., at 26sa (Juror 11) (“work[s] with someone who worked at Enron”); id., at 117sa; App. 940a (Juror 64) (two acquaintances lost money due to Enron’s collapse); Supp. App. 236sa (Juror 116) (work colleague lost money as a result of Enron’s bankruptcy).

 See also App. 850a (Juror 10) (“I haven’t followed [Enron-related news] in detail or to any extreme at all.”); id., at 856a (Juror 11) (did not “get into the details of [the Enron case]” and “just kind of tune[d] [it] out”); id., at 873a (Juror 20) (“I was out of [the] state when [Enron collapsed], and then personal circumstances kept me from paying much attention.”); id., at 892a (Juror 38) (recalled “nothing in particular” about media coverage); id., at 913a (Juror 50) (“I would hear it on the news and just let it filter in and out.”); id., at 935a (Juror 63) (“I don’t really pay attention.”); id., at 940a-941a (Juror 64) (had “[n]ot really” been keeping up with and did not recall any news about Enron); id., at 971a (Juror 84) (had not read “anything at all about Enron” because he did not “want to read that stuff” (internal quotation marks omitted)); id., at 983a (Juror 90) (“seldom” read the Houston Chronicle and did not watch news programs); id., at 995a-996a (Juror 99) (did not read newspapers or watch the news; “I don’t know the details on what [this case] is or what made it what it is”); id., at 1010a *391 (Juror 113) (“never really paid that much attention [to] it”); id., at 1013a (Juror 116) (had “rea[d] a number of different articles,” but “since it hasn’t affected me personally,” could not “specifically recall” any of them).

 Id., at 944a (Juror 67) (had not read the Houston Chronicle in the three months preceding the trial and volunteered: “I don’t form an opinion based on what ... I hear on the news”); id., at 974a-975a (Juror 87) (had not “formed any opinions” about Skilling’s guilt from news stories).

 As the D. C. Circuit observed, reviewing the impact on jurors of media coverage of the Watergate scandal, “[t]his may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which interest them may be less fascinating to the public generally.” United States v. Haldeman, 559 F. 2d 31, 62-63, n. 37 (1976). See also In re Charlotte Observer, 882 F. 2d 850, 855-856 (CA41989) (“[R]emarkably in the eyes of many,” “[e]ases such as those involving the Watergate defendants, the Ab-scam defendants, and . . . John DeLorean, all characterized by massive pretrial media reportage and commentary, nevertheless proceeded to trial with juries which... were satisfactorily disclosed to have been unaffected (indeed, in some instances blissfully unaware of or untouched) by that publicity.”); Brief for ABC, Inc., et al. as Amici Curiae 25-31 (describing other examples).

 One juror did not check any box, explaining that she lived in another State when Enron went bankrupt and therefore “was not fully aware of all the facts regarding Enron’s fall [and] the media coverage.” Supp. App. 62sa (Juror 20). Two other jurors, Juror 10 and Juror 63, indicated in answer to a different question that they had an opinion about Skilling’s guilt, but voir dire established they could be impartial. See infra, at 397-398, and 398, n. 33.

 The court viewed with skepticism, for example, Venire Member 104’s promises that she could “abide by law,” follow the court’s instructions, and find Skilling not guilty if the Government did not prove its case, App. 1004a; “I have to gauge . . . demeanor, all the answers she gave me,” the court stated, and “[s]he persuaded me that she could not be fair and impartial, so she’s excused,” id., at 1006a.

 Skilling emphasizes that voir dire did not weed out every juror who suffered from Enron’s collapse because the District Court failed to grant his for-cause challenge to Venire Member 29, whose retirement fund lost $50,000 due to ripple effects from the decline in the value of Enron stock. App. 880a. Critically, however, Venire Member 29 did not sit on Skilling’s jury: Instead, Skilling struck her using a peremptory challenge. “[I]f [a] defendant elects to cure [a trial judge’s erroneous for-cause ruling] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat,” we have held, “he has not been deprived of any . . . constitutional right.” United States v. Martinez-Salazar, 528 U. S. 304, 307 (2000). Indeed, the “use [of] a peremptory challenge to effect an instantaneous cure of the error” exemplifies “a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury.” Id., at 316.

 Skilling’s trial counsel and jury consultants apparently did not regard Juror 11 as so “obvious[ly] bias[ed],” Brief for Petitioner 35, as to warrant exercise of a peremptory challenge.

 Although Skilling raised no objection to Juror 10 and Juror 87 at trial, his briefs in this Court impugn their impartiality. Brief for Petitioner 14-15; Reply Brief 13. Even if we allowed these tardy pleas, the voir dire testimony of the two jurors gives sufficient assurance that they were unbiased. See, e. g., App. 850a-853a (Juror 10) (did not prejudge Skilling’s guilt, indicated he could follow the court’s instructions and make the Government prove its case, stated he could be fair to Skilling, and said he would “judge on the facts”); id., at 974a (Juror 87) (had “not formed an opinion” on whether Skilling was guilty and affirmed she could adhere to the presumption of innocence).

 Our decisions have rightly set a high bar for allegations of juror prejudice due to pretrial publicity. See, e. g., Mu’Min, 500 U. S. 415; Patton v. Yount, 467 U. S. 1025 (1984); Murphy v. Florida, 421 U. S. 794 (1975). News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates. And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide eases based on the evidence presented. Trial judges generally take care so to instruct jurors, and the District Court did just that in this case. App. 1026a.

 In addition to upholding honest-services prosecutions, courts also increasingly approved use of the mail-fraud statute to attack corruption that deprived victims of other kinds of intangible rights, including election fraud and privacy violations. See, e. g., Cleveland v. United States, 531 U. S. 12, 18, n. 2 (2000); McNally v. United States, 483 U. S. 350, 362-364, and nn. 1-4 (1987) (Stevens, J., dissenting).

 Courts have disagreed about whether §1346 prosecutions must be based on a violation of state law, compare, e. g., United States v. Brumley, 116 F. 3d 728, 734-735 (CA5 1997) (en banc), with, e. g., United States v. Weyhrauch, 548 F. 3d 1237, 1245-1246 (CA9 2008), vacated and remanded, post, p. 476; whether a defendant must contemplate that the victim suffer economic harm, compare, e. g., United States v. Sun-Diamond Growers of Cal., 138 F. 3d 961, 973 (CADC 1998), with, e. g., United States v. Black, 530 F. 3d 596, 600-602 (CA7 2008), vacated and remanded, post, p. 465; and whether the defendant must act in pursuit of private gain, compare, e. g., United States v. Bloom, 149 F. 3d 649, 655 (CA7 1998), with, e. g., United States v. Panarella, 277 F. 3d 678, 692 (CA3 2002).

 See, e. g., United States v. Rybicki, 354 F. 3d 124, 132 (CA2 2003) (en banc); United States v. Hausmann, 345 F. 3d 952, 958 (CA7 2003); United States v. Welch, 327 F. 3d 1081, 1109, n. 29 (CA10 2003); United States v. Frega, 179 F. 3d 793, 803 (CA9 1999); Brumley, 116 F. 3d, at 732-733; *404 United States v. Frost, 125 F. 3d 346, 370-372 (CA6 1997); United States v. Waymer, 55 F. 3d 564, 568-569 (CA11 1995); United States v. Bryan, 58 F. 3d 933, 941 (CA4 1995).

 Although verbal formulations varied slightly, the words employed by the Courts of Appeals prior to McNally described the same concept: “honest services,” e. g., United States v. Bruno, 809 F 2d 1097, 1105 (CA5 1987); “honest and faithful services,” e. g., United States v. Brown, 540 F. 2d 364, 374 (CA8 1976); and “faithful and honest services,” e. g., United States v. Diggs, 613 F. 2d 988, 998 (CADC 1979).

 We considered a similar Court-Congress interplay in McDermott Int’l, Inc. v. Wilander, 498 U. S. 337 (1991), which involved the interpretation of the term “seaman” in the Jones Act, 46 U. S. C. App. § 688 (2000 ed.). The Act, we recognized, “respond[ed] directly to” our decision in The Osceola, 189 U. S. 158 (1903), and “adopt[ed] without further elaboration the term used in” that case, so we “assume[d] that the Jones Act use[d] ‘seaman’ in the same way.” 498 U. S., at 342.

 “This cardinal principle has its roots in Chief Justice Marshall’s opinion for the Court in Murray v. The Charming Betsy, 2 Cranch 64, 118 (1804), and has for so long been applied by this Court that it is beyond debate.” Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council, 485 U. S. 568, 575 (1988). See, e. g., New York v. Ferber, 458 U. S. 747, 769, n. 24 (1982); NLRB v. Catholic Bishop of Chicago, 440 U. S. 490, 500-501 (1979); United States v. Thirty-seven Photographs, 402 U. S. 363, 368-370 (1971); Machinists v. Street, 367 U. S. 740, 749-750 (1961); United States v. Rumely, 345 U. S. 41, 45 (1953); Winters v. New York, 333 U. S. 507, 517 (1948); Crowell v. Benson, 285 U. S. 22, 62 (1932); Lucas v. Alexander, 279 U. S. 573, 577 (1929); Richmond Screw Anchor Co. v. United States, 275 U. S. 331, 346 (1928); Panama R. Co. v. Johnson, 264 U. S. 375, 390 (1924); United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U. S. 366, 407-408 (1909); United States v. Coombs, 12 Pet. 72, 76 (1838) (Story, J.); Parsons v. Bedford, 3 Pet. 433, 448-449 (1830) (Story, J.). Cf. Chaplinsky v. New Hampshire, 315 U. S. 568, 569, 573 (1942) (statute made it criminal to address “any offensive, derisive or annoying word” to any person in a public place; vagueness obviated by state-court construction of the statute to cover only words having “a direct tendency to cause acts of violence” by the addressee (internal quotation marks omitted)).

 Justice Scaua emphasizes divisions in the Courts of Appeals regarding the source and scope of fiduciary duties. Post, at 417-419. But these debates were rare in bribe and kickback cases. The existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute; examples include public official-public, see, e. g., United States v. Mandel, 591 F. 2d 1347 (CA4 1979); employee-employer, see, e. g., United States v. Bohonus, 628 F. 2d 1167 (CA9 1980); and union official-union members, see, e. g., United States v. Price, 788 F. 2d 234 (CA4 1986). See generally Chiarella v. United States, 445 U. S. 222, 233 (1980) (noting the “established doctrine that [a fiduciary] duty arises from a specific relationship between two parties”).

 Apprised that a broader reading of §1346 could render the statute impermissibly vague, Congress, we believe, would have drawn the honest-services line, as we do now, at bribery and kickback schemes. Cf. Levin *409 v. Commerce Energy, Inc., 560 U. S. 413, 427 (2010) (“[C]ourts may attempt ... to implement what the legislature would have willed had it been apprised of the constitutional infirmity.”); United States v. Booker, 543 U. S. 220, 246 (2005) (“We seek to determine what ‘Congress would have intended’ in light of the Court’s constitutional holding.”).

 Justice Scalia charges that our construction of §1346 is “not interpretation but invention.” Post, at 422. Stating that he “know[s] of no precedent for . . . ‘paring down’” the pre-McNally ease law to its core, post, at 422, he contends that the Court today “wieldfs] a power we long ago abjured: the power to define new federal crimes,” post, at 415. See also, e. g., post, at 422, 423, 424. As noted supra, at 405-406, and n. 40, eases “paring down” federal statutes to avoid constitutional shoals are legion. These cases recognize that the Court does not legislate, but instead respects the legislature, by preserving a statute through a limiting interpretation. See United States v. Lanier, 520 U. S. 259, 267-268, n. 6 (1997) (This Court does not “create a common law crime” by adopting a “narrow[ing] construction].” (internal quotation marks omitted)); supra, at 408 and this page, n. 42. Given that the Courts of Appeals uniformly recognized bribery and kickback schemes as honest-services fraud before McNally, 483 U. S. 350, and that these schemes composed the lion’s share of honest-services cases, limiting § 1346 to these heartland applications is surely “fairly possible.” Boos v. Barry, 485 U. S. 312, 331 (1988); cf. Clark v. Martinez, 543 U. S. 371, 380 (2005) (opinion for the Court by Scalia, J.) (when adopting a limiting construction, “[t]he lowest common denominator, as it were, must govern”). So construed, the statute is not unconstitutionally vague. See infra, at 412-413; post, at 421. Only by taking a wrecking ball to a statute that can be salvaged through a reasonable narrowing interpretation would we act out of step with precedent.

 If Congress were to take up the enterprise of criminalizing “undisclosed self-dealing by a public official or private employee,” Brief for United States 43, it would have to employ standards of sufficient definiteness and specificity to overcome due process concerns. The Government proposes a standard that prohibits the “taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty,” so long as the employee acts with a specific intent to deceive and the undisclosed conduct could influence the victim to change its behavior. Id., at 43-44. See also id., at 40-41. That formulation, however, leaves many questions unanswered. How direct or significant does the conflicting financial interest have to be? To what extent does the official action have to further that interest in order to amount to fraud? To whom should the disclosure be made, and what information should it convey? These questions and others call for particular care in attempting to formulate an adequate criminal prohibition in this context.

 Overlap with other federal statutes does not render § 1346 superfluous. The principal federal bribery statute, § 201, for example, generally applies only to federal public officials, so § 1346’s application to state and local corruption and to private-sector fraud reaches misconduct that might otherwise go unpunished.

 The Fifth Circuit appeared to prejudge this issue, noting that, “if any of the three objects of Skilling’s conspiracy offers a legally insufficient theory,” it “must set aside his conviction.” 554 F. 3d, at 543. That reasoning relied on the mistaken premise that Hedgpeth v. Pulido, 555 U. S. 57 (2008) (per curiam), governs only cases on collateral review. See 554 F. 3d, at 543, n. 10. Harmless-error analysis, we clarify, applies equally to cases on direct appeal. Accordingly, the Fifth Circuit, on remand, should take a fresh look at the parties’ harmless-error arguments.