# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

William D. Lewis, Appellant.

Appellate Case No. 2019-001815

———————

Appeal from Greenville County
G. Thomas Cooper, Jr., Circuit Court Judge

———————

Opinion No. 28051
Heard March 2, 2021 – Filed August 11, 2021

———————

## AFFIRMED

———————

Clarence Rauch Wise, of Greenwood, for Appellant.

Attorney General Alan McCrory Wilson and Senior
Assistant Attorney General Mark Reynolds Farthing, of
Columbia; Solicitor Kevin Scott Brackett, of York, all for
Respondent.

———————

**JUSTICE HEARN:** William Lewis, the former Sheriff of Greenville County, asks
us to hold the 1829 statute under which he was convicted for misconduct in office
relating to a sexual affair with an employee, void for vagueness. Specifically, he
asserts that Section 8-1-80 of the South Carolina Code (2019),[1] is unconstitutional

---

[1] Although minor amendments have been made to the statute, it is essentially the
same as it was originally enacted nearly two hundred years ago:

because it proscribes "official misconduct, corruption, fraud, or oppression" without defining those terms, and he also claims he was entitled to a directed verdict. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Will Lewis was elected sheriff of Greenville County in the 2016 general election after defeating the fourteen-year incumbent, Steve Loftis, in the primary election. Lewis hired Savannah Nabors, age twenty-two, with whom he had previously worked at a local law firm, to be his administrative coordinator during the transition period before being sworn into office. Nabors managed Lewis's scheduling, responded to emails, answered phone calls, and accompanied him to luncheons, meetings, and other business events. Nabors—whose starting salary was $62,000—was hired with no law enforcement experience and without the submission of a résumé or an interview. Nevertheless, she was provided with numerous benefits, including a new 2017 Ford Explorer equipped with a special "police package," an assigned parking place close to Lewis, a cell phone, an iPad, and a computer. Her receipt of a new Ford Explorer was particularly unusual because civilian employees typically were not provided with vehicles. In addition to her salary being more than double the starting salary of a new deputy, she received other "perks" at Lewis's direction, including participating in the BMW Performance Driving School, repelling and shooting with the SWAT team, and being fitted with a custom bulletproof vest. Basically, Nabors travelled with Lewis nearly everywhere he went, and at one point, Lewis told his deputies that Nabors was "off limits" to them.

In February 2017, Nabors told Lewis she was having marital difficulties and that she and her husband planned to divorce. Later that same evening, Lewis advised Nabors she would be accompanying him to an out-of-town meeting to discuss the budget with county officials. He indicated the meeting would be in either Atlanta or

---

Any public officer whose authority is limited to a single election or judicial district who is guilty of any *official misconduct*, habitual negligence, habitual drunkenness, *corruption, fraud, or oppression* shall be liable to indictment and, upon conviction thereof, shall be fined not more than one thousand dollars and imprisoned not more than one year.

Charlotte, and asked her which she preferred. Ultimately, Nabors accompanied Lewis, another individual from the sheriff's office, and three county officials to Charlotte for budget discussions on March 7-9, 2017. This was the first time the sheriff's office had met outside Greenville to discuss the budget. Lewis picked up Nabors from her house, and the two drove to Charlotte together. Upon arriving, Lewis placed a bottle of liquor in her luggage and told her that he would retrieve it later.[2] Once all six individuals arrived in Charlotte, the group had appetizers and drinks at the hotel bar, and then went downtown for more drinks.

While the exact details of the events were disputed at trial, both Lewis and Nabors stated a sexual encounter occurred once the two arrived back at the hotel later that first night. Nabors contended Lewis went to her room to retrieve his liquor bottle so they could have a "nightcap." According to Nabors, Lewis sat next to her on a couch, placed his arm around her, and tried to kiss her. The next thing she remembered was waking up in bed with Lewis on top of her engaging in sexual intercourse. Nabors testified she went to his room afterwards but returned sometime after 7:00 a.m. Conversely, Lewis testified the encounter was consensual, and that it was Nabors who moved toward him until they kissed. Lewis stated after they had sex, he immediately regretted it and returned to his room alone for the rest of the night.

The following day consisted of morning and afternoon budget meetings. Nabors did not attend the morning session, but joined the group in the afternoon meeting. However, she never took notes even though Lewis testified that was her responsibility and part of the reason for her attending. Later that evening, the group again had dinner and drinks. According to Nabors, Lewis left the group at one point, walked to CVS, and returned with a bottle of lubricant that he displayed to her, asking, "Which room, yours or mine?" Nabors responded, "Neither."

Nabors testified that Lewis again came to her room after texting her at 3:55 a.m. Upon opening the door, Lewis entered, apologized, and asked to stay with her because he did not want to be alone. Nabors testified she allowed Lewis to stay in her bed and at some time during the night, she woke up to Lewis digitally penetrating

---

[2] Lewis contended he placed a bottle of Jack Daniels on top of her travel bag because he did not think it would be best for a sheriff to be seen with it. Conversely, Nabors testified he placed it inside her bag, and the State argued he did so in order to have a reason to visit her room later that night.

her. Lewis denied purchasing lubricant or going to her room the second night,[3] and he contended nothing sexual happened other than the consensual encounter the first night. The group left Charlotte the next morning and returned to Greenville.

Over the course of the next six weeks, Nabors testified that Lewis acted appropriately at times but on other occasions, he continued to pursue a relationship with her. At one point, Lewis wanted to retrieve a pressure washer he had loaned Nabors, so she arranged for him to pick it up when she would not be home. To give him plenty of time to retrieve the washer, Nabors testified she drove to Chick-Fil-A. Lewis called her, and although he asked her where she was, when she looked in her rearview mirror, she saw him directly behind her in the drive-through line. As Lewis proceeded to follow Nabors home, she began recording their conversation. During that conversation, Lewis asked Nabors to join him in Reno for a sheriff's conference. However, Lewis stated that while the department would pay for two plane tickets, it would only pay for one hotel room, so Nabors would have to share a room with him. Nabors hedged, explaining it would not look good "on paper" for the two of them to share a room. Eventually, Lewis told Nabors he wanted her to join him in Reno so the two could "roll around in the bed together," sit around, and drink on "company time." After Nabors indicated she preferred their relationship to be nonsexual, Lewis responded that was "fine" but there would have to be changes, including her not accompanying him to meetings and other places for work. Nabors tendered her resignation on April 24, 2017.

In August of 2017, Nabors detailed the Charlotte trip in a personal blog and accused Lewis, although not specifically by name, of improprieties. Thereafter, she filed a civil lawsuit accompanied with several of the previously recorded conversations. Lewis held a press conference in October 2017 and admitted to the affair, but denied allegations of assault, rape, or stalking, maintaining the encounter was consensual.

---

[3] In response to Lewis's outright denial, the State introduced as impeachment evidence a portion of his deposition taken in a civil case filed by Nabors that was eventually settled. There, Lewis stated he did not recall whether he had purchased lubricant. At trial, his response shifted to a complete denial, and he indicated he went to CVS to buy Advil because he always suffered headaches when he stayed at a hotel. Lewis also denied texting Nabors at 3:55 a.m. despite phone records indicating a text to her from his phone stating, "Me." On cross-examination, Lewis speculated that Nabors may have sent the text herself because his phone was linked to her iPad.

Following a SLED investigation, Lewis was indicted in April 2018 for common law misconduct in office and obstruction of justice. Lewis filed a motion to quash the indictments, arguing they did not sufficiently place him on notice of the charges against him. In February and March of 2019, Lewis was indicted for statutory misconduct of a public officer and perjury, and superseding indictments for the two prior charges were also issued. Lewis sought to have these indictments quashed as well, contending they were vague and that the terms listed in section 8-1-80 were undefined, leaving a public official to speculate as to the prohibited conduct. The trial court held a hearing in June of 2019 and quashed one count each of the misconduct charges as being repetitive but upheld the remaining five counts. The court did not expressly rule on the constitutionality of section 8-1-80.

The State elected to pursue one count each of common law misconduct in office and misconduct by a public officer under section 8-1-80. At trial, Lewis renewed his objections to the indictments before the jury was sworn, and after the State rested, he argued both offenses were vague and overly broad and that there was no evidence of fraud. The court denied Lewis's motion. During the charge conference and ensuing jury instructions, Lewis objected to the terms of section 8-1-80 as being vague and overly broad. Ultimately, the jury acquitted Lewis of common law misconduct in office, but found him guilty of statutory misconduct of a public officer. The trial court sentenced Lewis to the maximum one-year imprisonment but granted his motion for an appeal bond approximately two weeks later. Lewis filed his appeal in this Court because of the substantial constitutional issue presented. *See* Rule 203(d)(1)(A)(ii), SCACR.

## ISSUES

I. Is Section 8-1-80 unconstitutionally vague when the statute does not define "official misconduct," "corruption," "fraud," or "oppression"?

II. Did the trial court err in failing to quash the indictment charging statutory misconduct of a public officer?

## STANDARD OF REVIEW

This Court's review of whether a statute is constitutional is limited. *State v. Simmons*, 430 S.C. 1, 9, 841 S.E.2d 845, 849 (2020), *reh'g denied* (May 22, 2020). Further, statutes are presumed constitutional and will not be set aside unless the party challenging the provision demonstrates "its repugnance to the constitution is clear

beyond a reasonable doubt." *In re Stephen W.*, 409 S.C. 73, 76, 761 S.E.2d 231, 232 (2014).

In criminal cases, the appellate court sits to review errors of law only. *State v. Baker*, 411 S.C. 583, 588, 769 S.E.2d 860, 863 (2015). Finally, on appeal from the denial of a directed verdict, an appellate court views all facts in the light most favorable to the nonmoving party. *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *Id.*

## DISCUSSION

### I. Constitutionality of Section 8-1-80

Lewis contends section 8-1-80 is unconstitutionally vague because it does not define the terms listed, encourages arbitrary enforcement, and fails to put a reasonable person on notice of what conduct is prohibited. Conversely, the State argues Lewis does not have standing to challenge the statute on vagueness grounds because the terms in section 8-1-80 clearly apply to his conduct.[4] Additionally, the State asserts the terms employed have recognized legal meanings, thereby adequately informing public officials of prohibited conduct. The State further contends the statute is not unconstitutionally overbroad because the provision does not implicate private conduct or speech. We agree with the State.

Section 8-1-80 provides for the criminal liability of any public officer who is guilty of *official misconduct*, habitual negligence, habitual drunkenness, *corruption, fraud, or oppression* and authorizes the imposition of a fine of up to $1000 and imprisonment of no more than one year, exactly as it did when enacted in 1829. S.C. Code Ann. § 8-1-80 (2019) (emphasis added).[5] While the italicized terms are undefined, when analyzing a statute for vagueness, the inquiry focuses on two independent grounds: whether the provision "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary

---

[4] As a threshold concern, the State contends Lewis's constitutional argument is not preserved for review because the trial court did not expressly rule on the issue. We disagree, as both parties and the trial court were well aware that the basis of Lewis's objections concerned the statute's failure to define the conduct giving rise to criminal liability.

[5] Habitual negligence and habitual drunkenness were not issues in this case and therefore not charged to the jury.

enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) ("Vagueness may invalidate a criminal law for either of two independent reasons."). Simply because a statute uses undefined terms or could have been drafted more precisely does not render it unconstitutionally vague. *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973) ("Words inevitably contain germs of uncertainty."). Instead, to satisfy due process concerns, a statute must be sufficiently definite to enable a person of common intelligence to not have to guess as to its meaning. *State v. Green*, 397 S.C. 268, 280, 724 S.E.2d 664, 670 (2012) (upholding our criminal solicitation of a minor statute in the face of a vagueness challenge because a person of "common intelligence would not have to guess at what conduct is prohibited by the statute"). Further, when a provision is sufficiently clear as to the conduct it proscribes, "the speculative danger of arbitrary enforcement [will] not render the ordinance void for vagueness." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 503 (1982).

Additionally, "'one to whose conduct the law clearly applies does not have standing to challenge it for vagueness' as applied to the conduct of others." *In re Amir X.S.*, 371 S.C. 380, 391, 639 S.E.2d 144, 150 (2006) (quoting *Vill. of Hoffman Estates,* 455 U.S. at 495); *Centaur, Inc. v. Richland Cty.*, 301 S.C. 374, 382, 392 S.E.2d 165, 170 (1990) (stating an operator of an adult bookstore did not have standing to challenge whether a county ordinance regulating sexually oriented businesses was unconstitutionally vague because the ordinance clearly applied to the operator's business). Stated differently, a litigant is barred from raising a facial challenge based on vagueness when his conduct clearly falls within the province of the statute. *S.C. Dep't of Soc. Servs. v. Michelle G.*, 407 S.C. 499, 507, 757 S.E.2d 388, 393 (2014) ("[W]hen raising a claim of unconstitutional vagueness, the litigant must demonstrate that the challenged statute is vague *as applied to his own conduct,* regardless of its potentially vague application to others.").

We hold that section 8-1-80 contains terms with settled legal meanings,[6] and the statute clearly applies to the conduct at issue here. The State theorized that Lewis

---

[6] We have noted, "[i]n ascertaining the meaning of language used in a statute, we presume the General Assembly is 'aware of the common law, and where a statute uses a term that has a well-recognized meaning in the law, the presumption is that the General Assembly intended to use the term in that sense.'" *Grier v. AMISUB of S.C., Inc.*, 397 S.C. 532, 536, 725 S.E.2d 693, 696 (2012) (quoting *State v. Bridgers,* 329 S.C. 11, 14, 495 S.E.2d 196, 198 (1997)). Accordingly, we find the definitions contained in Black's Law Dictionary instructive. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "corruption" as "[a] fiduciary's or official's

hired Nabors at an excessive salary and groomed her in order to pursue an affair. Throughout trial, evidence painted a picture of corruption and misconduct that predates our statutory misconduct statute.[7]  The linchpin of the State's case was that Lewis utilized the public fisc to curry sexual favors with Nabors and then threatened consequences when his advances were rejected.  To prove this, the State relied on Lewis's own recorded words, where, upon learning Nabors would not continue a sexual relationship with him, he replied: "I mean they'll [sic] be some changes.  I mean we'll have to make some changes."

We also find meritless Lewis's reliance on harmless hypotheticals which arguably implicate the statute.  Rather than considering, for example, whether using a government-issued cell phone for all personal as well as business calls would qualify as "official misconduct" or "corruption," our inquiry is focused solely on whether Lewis's conduct clearly falls within the statute.  We note that the United States Supreme Court, in addressing a federal circuit's use of "unproblematic

use of a station or office to procure some benefit either personally or for someone else, contrary to the rights of others; an act carried out with the intent of giving some advantage inconsistent with official duty or the rights of others"); *id.* (defining "official misconduct" as "[a] public officer's corrupt violation of assigned duties by malfeasance, misfeasance, or nonfeasance"); *id.* (defining "fraud" as "[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment" and noting it can be criminal, especially "when the conduct is willful"); *id.* (defining "oppression" as "[t]he act or an instance of unjustly exercising authority or power so that one or more people are unfairly or cruelly prevented from enjoying the same rights that other people have" or "[a]n offense consisting in the abuse of discretionary authority by a public officer who has an improper motive, as a result of which a person is injured").

[7] As the Ninth Circuit has aptly recognized, this pattern of behavior in exchange for sexual gratification dates back centuries, and was also even portrayed in one of William Shakespeare's most famous plays—*Measure for Measure*. *See People of the Territory of Guam v. Camacho*, 103 F.3d 863, 867 (9th Cir. 1996) ("Official misconduct can be criminal when advantages other than money accrue to the public servant in the wrongful exercise of office.  That sexual gratification should be prominent among these other advantages is not merely characteristic of our society; it reflects a long tradition in the misuse of authority.  The most famous play in English on the subject, Shakespeare's *Measure for Measure,* turns on officeholder Angelo's attempt to secure the seduction of the innocent Isabella.  Angelo's feigned use of his power to pardon Isabella's brother in order to get her consent is official misconduct.").

hypotheticals" as a means of finding a law governing child pornography unconstitutionally vague, stated:

> [T]he Eleventh Circuit's error is more fundamental than merely its selection of unproblematic hypotheticals. Its basic mistake lies in the belief that the mere fact that close cases can be envisioned renders a statute vague. That is not so. Close cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt.

*United States v. Williams*, 553 U.S. 285, 305–06 (2008). Accordingly, regardless of whether one could envision close cases that might sufficiently tip the scale to carry the vagueness challenge across the constitutional finish line, Lewis's argument concerning other, innocuous conduct which could come within the sweep of the statute is unavailing where the conduct here clearly falls within that prohibited by section 8-1-80.[8]

---

[8] Lewis also contends the trial court erred in declining to direct a verdict on the issue of fraud, which is one of the grounds listed in section 8-1-80. Importantly, Lewis did not challenge the sufficiency of the evidence as to the other three grounds charged to the jury—official misconduct, corruption, or oppression. We note that although the concurrence characterizes the alleged error in terms of the trial court's failure to define the meaning of fraud to the jury, the lens through which we view Lewis's assignment of error is whether there was sufficient evidence to support the jury's verdict. Following the State's case, defense counsel argued the statutory misconduct in office charge should not go to the jury, and after argument from both parties, the trial court concluded:

> I think there's evidence that goes beyond mere conjecture or suspicion, and that evidence, either direct or circumstantial, or some combination of both which reasonably intends [sic] to prove the guilt of the defendant, or from which that guilt might be logically and reasonably deduced, if that evidence is taken in the light most favorable to the State, so as to your second motion, I must respectfully deny that motion also.

During the charge conference, the trial court asked the parties more specifically about fraud, and Lewis's counsel responded that there was no evidence of a misrepresentation. The State countered by reciting evidence of what it believed was

## II. Sufficiency of the Indictment

fraud, and the trial court agreed to charge fraud to the jury. We believe counsel's argument, as understood by the trial court, was in the context of the sufficiency of the evidence. Further, in his brief before this Court, Lewis requests we enter a judgment of acquittal based on the State's failure to prove fraud and argues the case should not be remanded for a new trial, which would be the appropriate remedy for an erroneous jury charge. The relief requested by Lewis therefore bolsters our view that the error alleged involved the sufficiency of the evidence rather than a faulty jury instruction. Because we believe the jury's verdict was amply supported on other grounds submitted to the jury without objection—official misconduct, corruption, and oppression—any error in submitting the ground of fraud would not affect the integrity of the verdict. *See Griffin v. United States*, 502 U.S. 46, 50, 112 S. Ct. 466, 469, 116 L. Ed. 2d 371 (1991) (affirming a conviction based on an indictment alleging multiple grounds in a conspiracy charge where one of the grounds was valid despite no evidence supporting the remaining basis). In *Griffin*, the Supreme Court noted, "[i]t was settled law in England before the Declaration of Independence, and in this country long afterwards, that a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds—even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action." *Id.* at 49. Indeed, Justice Scalia noted precedent dating back to the eighteenth century where Lord Mansfield, Chief Justice of the King's Bench, explained, "that if there is any one count to support the verdict, it shall stand good, notwithstanding all the rest are bad." *Id.* (quoting *Claassen v. United States,* 142 U.S. 140, 146 (1891) (other citations omitted)). While Lord Mansfield may have applied the rule to multiple count indictments, Justice Scalia discussed how its application evolved into other contexts, including "the analogous situation at issue here: a general jury verdict under a *single* count charging the commission of an offense by two or more means." *Id.* at 50. That is precisely what we have here: a single count before the jury alleging four grounds supporting a violation of section 8-1-80. While the concurrence accurately explains the dichotomy between a challenge to the sufficiency of the evidence, *see Griffin*, versus one raising legal issues, *see Yates v. United States*, 354 U.S. 298, 312 (1957) (*overruled on other grounds by Burks v. United States*, 437 U.S. 1, 8 (1978)), because we view Lewis's argument as challenging the sufficiency of the evidence, we reject the concurrence's reasoning as to why *Griffin* does not apply. Therefore, we need not address whether the trial court was correct in submitting fraud to the jury.

Lewis also contends the indictment for misconduct of a public officer does not sufficiently notify him of the basis of the charge. He repeats his argument that the terms listed in section 8-1-80, which were also listed in the indictment, are overly vague and therefore do not indicate what conduct Lewis was called upon to defend at trial. Further, Lewis asserts while the indictment sufficiently alleges the "who," "what," and "where" of the offense, it is not specific as to the "when" and "how." Specifically, Lewis argues the indictment does not specify how he "misused public resources," and the timeframe is overly broad. Conversely, the State asserts the indictment, when viewed with a practical eye, should be upheld, especially considering that misconduct by a public official can be committed in various ways. We agree with the State.

> The indictment at issue alleged:
>
> William D. Lewis did, on or about January 3, 2017, through April 17, 2018, commit the crime of Misconduct of a Public Officer. During the above listed dates, William D. Lewis was the Greenville County Sheriff who is a public officer whose authority is limited to the single election district of Greenville County, South Carolina. William D. Lewis committed the crime of misconduct of a public officer by performing acts of official misconduct, habitual negligence, corruption, fraud, or oppression. To wit:
>
> Count One
>
> William D. Lewis did, from the date he took office through April 24, 2017, misuse public resources and abuse the power and authority of his office for the corrupt purpose of pursuing or facilitating an adulterous relationship.

The primary purpose of an indictment is threefold: to put the defendant on notice of the elements of the offense; to allow him to decide whether to plead guilty or stand trial; and to enable the trial court to know what judgment to pronounce following a conviction. *Evans v. State*, 363 S.C. 495, 508, 611 S.E.2d 510, 517 (2005). The indictment must list the offense with "sufficient certainty and particularity." *State v. Gentry*, 363 S.C. 93, 102, 610 S.E.2d 494, 500 (2005). Importantly, "[i]n determining whether an indictment meets the sufficiency standard, the court must look at the indictment with a practical eye in view of all the surrounding circumstances." *Id.* at 103, 610 S.E.2d at 500. Further, "one is to look at the 'surrounding circumstances' that existed pre-trial, in order to determine whether a

given defendant has been 'prejudiced,' i.e., taken by surprise and hence unable to combat the charges against him." *State v. Baker*, 411 S.C. 583, 589, 769 S.E.2d 860, 864 (2015) (quoting *State v. Wade,* 306 S.C. 79, 86, 409 S.E.2d 780, 784 (1991)). "[W]hether the indictment could be more definite or certain is irrelevant." *Gentry*, 363 S.C. at 103, 610 S.E.2d at 500. Notably, the threshold for an indictment to be valid is generally not high. *See United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996), *aff'd,* 522 U.S. 23 (1997) ("Facial sufficiency is not a high hurdle. Indictments need not exhaustively describe the facts surrounding a crime's commission nor provide lengthy explanations of the elements of the offense.").

Statutory misconduct by a public officer, like the common law crime, is an offense that is "versatile [in] nature." *State v. Hess*, 279 S.C. 525, 528, 309 S.E.2d 741, 743 (1983). This practical consideration factors into the analysis of whether the indictment sufficiently alleged how Lewis violated section 8-1-80. The indictment identified Lewis as the sheriff, listed the timeframe ("from the day he took office through April 24, 2017"), and narrowed the allegations ("misuse [of] public resources and abuse [of] the power and authority of his office for the corrupt purpose of pursuing or facilitating an adulterous relationship"). While Lewis argues any set of facts could qualify as the "misuse of public resources," this term was connected to those impermissible acts that served the "corrupt purpose" of advancing his illicit affair with an employee. While it may have been preferable for the State to have articulated the precise acts that demonstrated the "misuse [of] public resources," or the "abuse [of] power and authority of his office," we agree with the State that it was not required to go so far as to list the specific theory as to how Lewis committed statutory misconduct. *See generally State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000) ("[A]n indictment need not allege the specific theory or means by which the State intends to prove each element of an offense to achieve the overriding purpose of notice to the accused."). Instead, the indictment satisfied all three considerations required by our jurisprudence, and it is clear from the record that Lewis was not surprised and certainly not ambushed at trial by the allegations against him. Additionally, even if the indictment was questionable, further specificity was available by reviewing the discovery materials.[9] Accordingly, the trial court did not err in declining to quash the indictment.

---

[9] While this Court is required to view the sufficiency of an indictment through a practical lens, we caution that discovery may not always be sufficient to uphold an otherwise questionable indictment. *See, e.g., State v. Wright*, 999 P.2d 1220, 1226 (Or. Ct. App. 2000) (noting while discovery generally is sufficient to cure imprecision in charging instruments, there are exceptions, especially when "given the nature or complexity of the crime, or the sheer volume of potential discovery,

## CONCLUSION

For the foregoing reasons, we affirm Lewis's conviction for misconduct of a public officer.

**AFFIRMED.**

**BEATTY, C.J., KITTREDGE, and JAMES, JJ., concur. FEW, J., concurring in a separate opinion.**

---

discovery cannot, as a practical matter, cure the imprecision of the charging instrument").

**JUSTICE FEW:** Will Lewis's central issue on appeal is his challenge to the vague and undefined nature of the statutory crime of misconduct in office. He makes this challenge in each of the three issues he raises to this Court. The majority addresses the challenge as it relates to Lewis's first and second issues: the constitutionality of section 8-1-80 of the South Carolina Code (2019) and the sufficiency of the indictment. I agree with the majority's disposition of these issues, which it addresses in Sections I and II of the majority opinion, respectively. However, Lewis also challenges—his strongest point in my view—the trial court's failure to give the jury meaningful requirements, elements, or standards by which the jury could determine whether Lewis's conduct—outrageous and disgusting, to be sure—was criminal. The majority avoids addressing this third issue by invoking a rule of procedural default. *See supra* note 8. I would address the merits of Lewis's third issue and hold the trial court erred in failing to define fraud as a factual basis for convicting Lewis of misconduct in office.

There are three reasons this Court should not invoke the rule of procedural default the majority employs to avoid addressing Lewis's third issue. First, the rule has never been applied in a criminal case in this State. For my second and third reasons, this is not the time to start. Second, we hardly discussed it. The State raised it only in passing, literally on the last page of text in its forty-eight page brief, in a parenthetical to its citation of a civil case which is not the case mentioned by the majority. The State made no argument as to how this civil rule applies in a criminal case or why this case should be the first one in which we ever do so. The State's reference to the civil case in its brief was so quick that defense counsel—one of the most experienced criminal appellate lawyers in South Carolina—did not realize the State raised it and did not address it among several other issue preservation points he made in his reply brief. Importantly, we did not discuss the procedural default rule the majority invokes with either party at oral argument.

Third, and most importantly, I believe the majority applies the rule of procedural default incorrectly. The majority characterizes Lewis's third issue as a challenge to the sufficiency of the State's evidence. The case cited by the majority—again, not the case summarily cited by the State in its brief—supports the majority's finding of procedural default *only* if the majority is correct that Lewis's third issue relates only to the sufficiency of the evidence. I read Lewis's brief and interpret counsels' oral arguments differently. I understand the third issue to be a legal challenge to the trial court's refusal to define fraud for the jury. If I am correct Lewis raises a point of law, then the question of procedural default is not controlled by *Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), as the majority contends, but is controlled by *Yates v. United States*, 354 U.S. 298, 312, 77 S. Ct.

1064, 1073, 1 L. Ed. 2d 1356, 1371 (1957).[10]  *Yates* requires we address the merits, as I will not trouble my reader to explain in detail here.  I will let it suffice to refer to the *Griffin* Court's explanation that the point of law it finds is applicable to factual insufficiency does not apply to legal errors,

> Petitioner cites no case, and we are aware of none, in which we have set aside a general verdict because one of the possible bases of conviction was neither unconstitutional as in *Stromberg*,[11] nor even illegal as in *Yates*, but merely unsupported by sufficient evidence.

502 U.S. at 56, 112 S. Ct. at 472, 116 L. Ed. 2d 371 at 380.  The Court then discussed *Turner v. United States*, 396 U.S. 398, 420, 90 S. Ct. 642, 654, 24 L.Ed.2d 610, 625-26 (1970), pointing out the "general rule" *Turner* recites and upon which the lower courts in *Griffin* relied depends on "insufficiency of proof," and upheld the distinction between *Turner* and the "legal error" basis of *Yates*.  502 U.S. at 58-59, 112 S. Ct. at 474, 116 L. Ed. 2d at 382.  The Court stated there is "a clear line that will separate *Turner* from *Yates*, and it happens to be a line that makes good sense."  502 U.S. at 59, 112 S. Ct. at 474, 116 L. Ed. 2d at 382.  The Court explained,

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime.  When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.  Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence . . . .

---

[10] *Yates* was overruled on other grounds.  *Burks v. United States*, 437 U.S. 1, 8-10, 98 S. Ct. 2141, 2145-47, 57 L. Ed. 2d 1, 7-9 (1978).

[11] The Supreme Court was referring to *Stromberg v. California*, 283 U.S. 359, 51 S. Ct. 532, 75 L. Ed. 1117 (1931).

502 U.S. at 59, 112 S. Ct. at 474, 116 L. Ed. 2d at 382-83.

*Griffin*, therefore, was controlled by *Turner*, but *Griffin* upheld *Yates*. This case—in my view—is controlled by *Yates*. The majority's reliance on *Griffin* in this case is error and is contrary to *Yates*.

Turning to the merits, I agree with Lewis the misconduct in office statute—section 8-1-80—is so vague as to "simply provide[] no guidance as to what constitutes the crime." Appellant Br. 8. "To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling v. United States*, 561 U.S. 358, 402-03, 130 S. Ct. 2896, 2927-28, 177 L. Ed. 2d 619, 656 (2010) (alteration in original) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 1858, 75 L. Ed. 2d 903, 909 (1983)); *see also Toussaint v. State Bd. of Med. Exam'rs*, 303 S.C. 316, 320, 400 S.E.2d 488, 491 (1991) ("A law is unconstitutionally vague if it forbids or requires the doing of an act in terms so vague that [women and] men of common intelligence must necessarily guess as to its meaning and differ as to its application." (citing *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 127, 70 L. Ed. 322, 328 (1926))).

Lewis makes his challenge to the vagueness of section 8-1-80 in all three sections of his brief. In his "Question 1," which the majority addresses in Section I, he argues "an overly broad statute may simply delegate to the discretion of law enforcement officers or prosecutors the actual implementation of the social harm the statute is designed to prohibit." In his "Question 2," which the majority addresses in Section II, he argues the indictment for violating the statute "did not inform Mr. Lewis of the specific act . . . he committed so that he could properly prepare a defense to refute the allegations." I agree with the majority's disposition of these two issues.

In his "Question 3," however, Lewis makes the legal point I discussed above. He argues "the trial judge . . . gave the jury no guidance" as to what conduct violated the statute. Appellant Br. 23. Here, however, Lewis goes beyond the statute and argues the trial court failed to define for the jury the operative terms—the factual premises—in the State's case against him: official misconduct, corruption, fraud, and oppression. As Lewis concedes, the trial court made at least a summary effort to define official misconduct, corruption, and oppression. Lewis's argument is the trial court made no effort to define "fraud." By failing to define fraud, Lewis argues, the trial court left the crime of which he was charged undefined, "with[out] sufficient definiteness that ordinary [jurors] can understand what conduct is prohibited,"

*Skilling*, 561 U.S. at 402, 130 S. Ct. at 2927, 177 L. Ed. 2d at 656, so that jurors "of common intelligence must necessarily guess as to [the crime's] meaning and [might] differ as to its application," *Toussaint*, 303 S.C. at 320, 400 S.E.2d at 491.

I agree. In civil cases, we require trial courts to go to great lengths to define the nine elements of fraud. *See, e.g.*, *Mishoe v. Gen. Motors Acceptance Corp.*, 234 S.C. 182, 193, 107 S.E.2d 43, 49 (1958) (listing nine elements) (quoting *Flowers v. Price*, 190 S.C. 392, 395, 3 S.E.2d 38, 39 (1939)). It is absurd to suggest that when fraud becomes the basis for a crime, it is no longer necessary to define the term. Rather, the need is heightened in a criminal case to give the jury meaningful requirements, elements, or standards by which it must judge the defendant's conduct. As the Supreme Court of the United States stated, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S. Ct. 2294, 2299, 33 L. Ed. 2d 222, 227-28 (1972).

The question then becomes whether the trial court's error in refusing to define fraud is reversible. I have no doubt the error prejudiced Lewis as to the State's fraud theory of misconduct in office. *See State v. Stukes*, 416 S.C. 493, 498, 787 S.E.2d 480, 482 (2016) (stating "the charge must be prejudicial to the appellant to warrant a new trial" (citing *State v. Curry*, 406 S.C. 364, 373, 752 S.E.2d 263, 267 (2013))). In the charge conference the trial court conducted at the conclusion of the evidence, Lewis raised the question of whether the evidence satisfied the legal definition of fraud.[12] The trial court then asked the State, "Tell me about fraud." The State responded, "I intend to argue . . . that everything he did with Savannah Nabors, from hiring her at her salary, providing the perks that he did, was all a fraud perpetrated on the taxpayers . . . of Greenville all the way through the trip to Charlotte." In his closing

---

[12] Here is the point at which counsel could have been more clear with the trial court as to the basis for his argument. Counsel stated, "It's back again to the problem involving the statutory language. I don't think all of them remotely apply in this case. And there just aren't good definitions for a lot of them. I don't see how fraud is in this case." To me, read in context, counsel is arguing the proper definition of fraud, if charged to the jury, requires a finding there was no fraud. I cannot dispute, however, counsel left room for the majority's conclusion he was discussing the sufficiency of the evidence.

argument to the jury, the Solicitor argued Lewis was guilty of "fraud in that he has this money that's given to him for one purpose and then he's using it for another, not wanting to tell anybody about it." These arguments correctly paint Lewis as a fraud, in the term's colloquial sense, but they do not satisfy the legal definition of criminal fraud. If the trial court had defined fraud for the jury, in my opinion, the jury could not have convicted him of misconduct in office on the basis of the State's fraud argument. As Lewis points out in his brief, what the State argues here might be breach of trust, but it is not fraud. To prove fraud under a proper legal definition, the State was required to prove numerous additional facts, such as Lewis made a false representation to get the money, the County relied on the falsity in giving him the money, and Lewis did it all with criminal intent.

Even prejudicial error is not reversible, however, if it is harmless beyond a reasonable doubt. *See State v. Simmons*, 423 S.C. 552, 566, 816 S.E.2d 566, 574 (2018) ("If a review of the entire record does not establish that the error was harmless beyond a reasonable doubt, then the conviction shall be reversed."). In other words, if there was overwhelming evidence Lewis was guilty of misconduct in office on one of the State's other theories, we should not reverse the conviction. The Solicitor laid out the State's case in compelling terms in other sections of his closing argument, without relying on his argument Lewis committed fraud. The majority summarizes the argument in reaching its conclusion "the statute clearly applies to the conduct at issue here." I agree. In my view, the irrefutable facts that Lewis hired the inexperienced Nabors at an absurdly high salary, showered her with perks and favors that bore no relationship to her work-related responsibilities (particularly the new Ford Explorer with "police package"), aggressively used those undeserved benefits to pressure her into a sexual relationship, openly threatened to withdraw the benefits if she did not give in to his sexual advances, and did all this at the expense of taxpayers, leaves no doubt whatsoever Lewis is guilty of the crime misconduct in office.

I concur in result.